**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN CRAIG JAMES,
  *Petitioner-Appellant,*

v.

CHARLES L. RYAN,
  *Respondent-Appellee.*

No. 08-99016

D.C. No.
2:00CV-01118-
NVW

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
March 17, 2011—San Francisco, California

Filed February 29, 2012

Before: William A. Fletcher, Marsha S. Berzon, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge William A. Fletcher

## COUNSEL

Gary T. Lowenthal, Santa Fe, New Mexico, Thomas James Phalen, Phoenix, Arizona, for the petitioner.

Kent Ernest Cattani, ARIZONA ATTORNEY GENERAL'S OFFICE, Phoenix, Arizona, Amy Pignatella Cain, ARIZONA ATTORNEY GENERAL'S OFFICE, Tucson, Arizona, for the respondent.

## ORDER

This court's Opinion filed October 12, 2011, and reported at 659 F.3d 855 (9th Cir. 2011), is withdrawn, and is replaced by the attached Opinion.

With the filing of the new Opinion, the panel votes unanimously to deny the petition for rehearing and the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc, filed November 23, 2011, are DENIED.

No further petitions for rehearing or rehearing en banc will be accepted.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Death-sentenced prisoner Steven James appeals the district court's denial of his petition for a writ of habeas corpus. James, Lawrence Libberton, and Martin Norton were convicted in separate proceedings in Arizona state court of crimes connected to the 1981 murder of Juan Maya. James, Libberton, and Norton severely beat Maya, drove him to an isolated desert area, killed him by shooting him and striking him with rocks, and threw his body down an abandoned mine shaft. Norton, who was 14 years old at the time of the murder, agreed to testify against James and Libberton and to plead guilty in juvenile court to first-degree murder, kidnapping, armed robbery, and credit card fraud. In exchange for his testimony and guilty plea, Norton was committed to juvenile detention until he turned 18, with no subsequent incarceration. Libberton was convicted of first-degree murder, aggravated kidnapping, robbery, and theft, and sentenced to death. *State v. Libberton*, 685 P.2d 1284, 1286 (Ariz. 1984). A panel of this court granted Libberton habeas relief with respect to his death sentence. *Libberton v. Ryan*, 583 F.3d 1147, 1151-52 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 3412 (2010). James was convicted of first-degree murder and kidnapping, and sentenced to death. *State v. James*, 685 P.2d 1293, 1296 (Ariz. 1984).

James raises three grounds for relief. First, he claims that the state failed to disclose an oral plea agreement with Nor-

ton, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Second, he claims that the state failed to correct Norton's false testimony denying the existence of this agreement, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Third, he claims that his trial counsel provided ineffective assistance at the penalty phase, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).

We affirm the denial of relief with respect to James's guilt-phase claims based on *Brady*, *Giglio*, and *Napue*. However, we reverse with respect to James's penalty-phase claim of ineffective assistance of counsel, which was not decided on the merits in state court. We conclude that counsel's complete failure to investigate and present mitigating evidence of James's troubled childhood, his mental illness, and his history of chronic drug abuse constituted deficient performance. We further conclude that this failure prejudiced James because it prevented the sentencing judge from learning that James had "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *see also, e.g.*, *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring))). We therefore grant the writ with respect to James's death sentence.

## I. Factual and Procedural Background

### A. Factual Background

#### 1. The Investigation

On November 17, 1981, James, Libberton, Norton, and Daniel McIntosh were arrested at a bank in Phoenix after Lib-

berton attempted to obtain a cash advance on a credit card belonging to Maya. Libberton was arrested either inside or just outside the bank. James, Norton, and McIntosh were arrested in the bank's parking lot where they were waiting in a 1975 Ford Thunderbird registered to Maya. Libberton was booked on a forgery charge, but the others were interviewed and released. Two days later, after Maya's father filed a missing person report on his son — and after receiving a tip from McIntosh, who had heard James and Libberton bragging about killing Maya — police located and rearrested James and Norton.

James gave a statement to Detective Russell Davis in which he recounted that Norton, followed by Maya, had burst through the door of James's trailer on the night of November 16, claiming that Maya "was following him and trying to rape him." Norton retrieved a revolver from James's trailer and chased Maya outside into the trailer park. After a short time, Norton returned with Maya, sat him down on James's couch, and "slapped [Maya] around, trying to get him to tell where his money was at." James stated that Libberton and Norton then walked Maya outside to his own car. James stated that he took the wheel and the group left in Maya's car. At that point in the interview, James requested counsel, but shortly thereafter volunteered to show police Maya's body. *See Libberton*, 583 F.3d at 1152; *James*, 685 P.2d at 1296.

With James giving directions, Detective Davis and Sergeant Michael Midkiff drove about two hours west of Phoenix to property owned by James's adoptive parents in the desert outside Salome, Arizona. James led Davis and Midkiff to an abandoned mine shaft several hundred yards from the entrance to the property. Maya's body lay at the bottom, covered with railroad ties and a rusted pipe. Tire tracks that appeared to match the treads on the tires of Maya's Thunderbird ran from the entrance of the property to the base of the incline where the shaft was located, and a shoeprint that appeared to match the tread on Maya's shoes was found on

the incline leading up to the shaft. Two drag marks, about as far apart as the distance between a person's feet would be, ran from a bloodstained area of terrain at the top of the incline to the shaft's entrance. Blood and hair consistent with Maya's were found matted on several rocks scattered around the entrance to the mine; on the sides of the shaft; and on the railroad ties that lay across the opening of the shaft. The railroad ties and the rusted pipe on Maya's body were not bloodstained, suggesting that they had been thrown down onto Maya. An autopsy revealed that Maya suffered lacerations to both sides of his scalp, a complicated skull fracture, and bruises and abrasions to his forehead, chin, nose, cheek, and ear. Maya died of head injuries that included a hemorrhage and bruises to the surface of his brain, which were consistent with blows from rocks or a heavy board.

## 2. Norton's Statements

Norton gave several statements. Each statement inculpated James, Libberton, and himself in progressively greater detail. Because James's *Brady*, *Giglio*, and *Napue* claims turn on Norton's statements, and the differences among them, we recount them at some length. *See generally Libberton*, 583 F.3d at 1152-56. During his first interview on November 19, Norton told Detective Davis different versions of what happened to Maya. Norton first said that he was hitchhiking when Maya picked him up at around 11:30 p.m. on November 16. Norton said that Maya "started talking about gay power," so Norton asked to be let out of Maya's car. Maya agreed but kept following Norton until Norton managed to evade Maya near a local elementary school. Norton then acknowledged that he had hit Maya. Norton said that Maya "tried to get in my pants. He puts his arm around me. He tried to kiss me. I hit him and I hit him." Norton told Davis that he hit Maya in the throat and the solar plexus because "I know where to hit people." Norton stated that he broke free and escaped to James's trailer, where he told James and Libberton that Maya

had attacked him. James and Libberton went looking for Maya but could not find him.

Norton's story then changed. In this version, Norton rebuffed Maya's sexual advances and got out of Maya's car, but now Maya followed Norton inside James's trailer. Norton told James, "[T]his is the guy," whereupon James kicked Maya in the leg. Maya fled the trailer, but Norton, James, and Libberton pursued Maya and soon "had him surrounded." Norton punched Maya in the stomach. The group brought Maya back into the trailer, where James and Libberton took turns beating Maya "in the face, the stomach, and the balls. . . . [Libberton] said he broke [Maya's] nose." James and Libberton talked quietly out of earshot for a few minutes, then took Maya by the arm and walked him outside to his car. Norton said that James and Libberton returned after about three hours without Maya. James told Norton "not to tell a soul about this or [Norton] would die the same way [Maya] did."

On November 26, Norton, then detained in a juvenile facility, gave a statement to Detective Jack Hackworth in which he admitted for the first time his own participation in Maya's murder. Norton's story again began with Maya picking him up while hitchhiking. Norton said that he became frightened when Maya secured the electric locks on his car doors, and that he proposed that Maya come to James's trailer because Norton "had a friend that was also queer there and they could make out." Norton stated that he "sort of lured [Maya] into the trailer in order to get away from him. . . . 'I told him Steve was gay and queer and he would make him happy if he'd come in the trailer.' " According to the interview notes, once Maya followed Norton into the trailer, Norton "turned to Steve and [Libberton] and said, 'He's a queer.' . . . [A]t that time Steve kicked [Maya], knocking him down, and he and [Libberton] both began to beat the man in the trailer." James and Libberton beat Maya until he was bleeding from the nose and mouth. James took Maya's wallet and threw it to Norton, who removed Maya's credit cards. Maya pleaded, "Take my

car and my credit cards and money if you want to but don't hit me anymore." Norton "slapped [Maya] upside the face with his right hand, telling him, 'Don't smart off, queer.'"

James then produced a revolver and he, Norton, and Libberton walked Maya to Maya's car. The group drove off, stopping at a gas station where James used one of Maya's credit cards to buy a tank of gas and a carton of cigarettes. On the way to the mine, the group discussed shooting Maya and throwing him into the shaft. Norton said that Maya "just sat in the back seat[,] but I know he heard what [Libberton] and Steve were saying." When the group arrived at James's parents' property, Norton asked James if he was serious about killing Maya. James responded, "Yes, we're going to shoot him." Norton suggested breaking Maya's legs and throwing him in the shaft instead, but Libberton countered, "[I]f we don't kill him, he will snitch us off." When the group reached the mine, it was almost daylight. James walked Maya at gunpoint up to the shaft and shot Maya in the left forearm. James passed the revolver to Norton, who passed it to Libberton without shooting. Libberton shot Maya in the head, then returned the revolver to James, who did the same. Norton stated that Maya was not dead, so both James and Libberton "mashed [Maya's] head in" with large rocks. James and Libberton forced Norton to do the same. Norton threw one rock and missed, then threw another, hitting Maya in the back. James and Libberton dragged Maya's body to the shaft and threw him in. On the drive back to Phoenix, James and Libberton both told Norton that "if I told anyone, I would be in the shaft with him."

Norton gave a final pretrial statement on December 29. By this time, the state had filed a juvenile delinquency petition charging Norton with murder, kidnapping, and armed robbery, as well as a request to transfer Norton's case from juvenile to adult court. On December 29, Norton, represented by appointed counsel Robert Wertsching, gave a tape-recorded statement to Detective Davis and Maricopa Deputy County

Attorney Myrna Parker, the lead prosecutor at the trials of both James and Libberton.

During James's federal habeas corpus proceedings in 1993, his counsel Gary Lowenthal obtained an affidavit in which Wertsching stated that soon after his appointment as Norton's lawyer, he "had at least two conversations with the head prosecutor of the juvenile division of the Maricopa County Attorney's office on the subject of whether the County Attorney would agree not to seek transfer of Mr. Norton to adult court." Wertsching stated in his affidavit that "the head of the juvenile division indicated orally that if Mr. Norton would give a full and accurate statement to the County Attorney and would testify consistently with that statement at the trials of the adults who participated in the homicide offense, the County Attorney would not seek to have [Norton] transferred to adult court." When Norton gave his December 29 statement, therefore, both he and Wertsching "expected that if [Norton] was truthful in the debriefing and cooperated fully with the prosecution of the adult defendants, he would not be remanded to adult court. . . . Subsequent to the formal jail interview with Myrna Parker, [Norton] and I signed a formal written agreement that conformed with the oral understanding I had previously reached with the juvenile division prosecutor."

Parker began the interview, which was recorded and transcribed verbatim, by telling Norton:

> I'm offering you absolutely nothing today except that [ ] I'm not going to use any of the statements that you make today against you. . . . The end result of this interview with you is that we are going to attempt to set up an agreement between you, your attorney and the county attorney's office regarding the charges that are now pending against you in the death of [Maya]. None of that has been put down in writing at this time, and in fact we haven't even explored what those possibilities may be. It will all

depend on your truthfulness during this interview today.

Norton stated that, at the time of the murder, he had been living with James for about a week. He described James as "big," "heavy," and "real mean." Norton said that James "was really heavy into drugs, marijuana, cocaine, heroin." Norton knew that James kept a loaded .44 revolver under a chair in his living room "because his wife had been kidnapped from what I hear and he wanted that for protection." Norton said that on November 16, he, James, Libberton, McIntosh, and Norton's friend "Ralph" were smoking marijuana at James's trailer. Norton and "Ralph" left the trailer around 10:30 p.m. to "dine and dash" — that is, to eat and then skip out on the check — at a local diner. Norton said that James had been drinking vodka and smoking marijuana and was not drunk when he left, but was "on the way there" and "feeling good." James was "more high than he was drunk" and "staggered a little bit when he went to the restroom." Norton and "Ralph" were caught trying to dodge the check at the diner, picked up by police, and taken to their parents' homes. Norton stayed at his mother's home "about 10 minutes, . . . smoked a couple of joints," and left to hitchhike to James's trailer.

Maya picked Norton up and drove him to James's trailer. Maya parked outside, locked the car doors, and tried to "get on top of" Norton. Norton "started struggling to get away from him" but Maya persisted, telling Norton, "Don't stop me." Maya attempted to remove Norton's pants, but Norton "pushed him away and he got back on me and wouldn't let me go. . . . He was starting to breath[e] harder and he kept kissing me and I kept pushing away from him." Maya "unsnapped" Norton's pants and got them "half way unzipped." Norton continued to resist, finally proposing that Maya come into James's trailer because "I have a friend in there who's gay and he'll give you what you want and you don't have to get me." Maya hesitated but agreed.

Once inside, Norton hid behind James and said, "[']Steve[,] get him away from me.[' James] looked at me and looked at him and I said, 'He's a queer, get him away from me,' and [James] kicked him." Maya fled outside into the trailer park, but James and Libberton pursued him and brought him back inside. When James and Libberton returned, Maya's "nose was bleeding real bad." James sat Maya down on the couch in the trailer and began to beat him. James then invited Norton to beat Maya, and Norton "hit him as hard as I could . . . [i]n the jaw," three times. Libberton then struck Maya in the face, possibly breaking his nose, and causing more bleeding. The group continued beating and taunting Maya. Eventually, James pointed the revolver at Maya and demanded his wallet, which James then turned over to Norton. Norton removed Maya's cash, credit cards, and identification. Libberton retrieved the title to Maya's car from his wallet and forced Maya to sign it over. James took a small ring and a turquoise bracelet from Maya. Libberton took Maya's belt from a suitcase in the trunk of Maya's car and said, "[S]eeing how I got the car and everything else signed over to my name, I'm going to wear his belt, so I'll be Juan Maya."

After some time, James asked the group what they planned to do with Maya. Libberton suggested letting Maya go, and Norton suggested beating Maya further. James responded, "[T]hat ain't going to do no good, he'll come right back. . . . [T]he only thing we can do is kill him." When Libberton objected that the murder would be discovered, James replied, "there's no way we'll get caught because I know a perfect place to put the body." James then described the mine outside Salome. The group led Maya to his car, where Libberton sat in the backseat with Maya, holding him at gunpoint. "All the way [Maya] was saying, [']I have a wife,['] and Steve said, ['S]hut the fuck up, we don't want to hear your sad stories.[']" Norton said that the group stopped at a gas station where James purchased gas and cigarettes using one of Maya's credit cards. Norton also said that a police officer stopped the car for speeding on the drive between the gas sta-

tion and the mine. While Libberton held the revolver on Maya, James got out of the car to talk to the officer behind the vehicle. After speaking with James, the officer sent the car on its way. James "was drunk, he was high too," but had nonetheless talked his way out of receiving a ticket. Upon returning to the car, James said, "[S]ee Marty, all you got to do is learn how to talk to those pigs and they'll do whatever you want."

When the group arrived at the mine, Norton attempted to dissuade James and Libberton from carrying out the murder, suggesting instead that the group break Maya's legs and throw him down the shaft. James said, "[W]e'll have to kill him anyway. . . . [W]e've gone too far, we have to do it." Libberton said, "Marty[,] it will be all right, we went this far, we're going to go all the way." Norton stated that "I told [Maya] I'm sorry this has to happen." Maya said, "I wish this wouldn't happen to me either. I wish you could talk your friends out of this." Libberton, still holding the revolver, walked Maya up a hill to the shaft. James took the revolver from Libberton, allowed Maya to finish smoking a cigarette, then directed Maya to stand next to the shaft. Maya pleaded with James, "[W]ait a minute, wait a minute. Don't kill me, please don't kill me." James fired at Maya's upper body.

According to Norton, the revolver went off but Maya was not badly hurt and began to grapple with James for the revolver. Libberton hit Maya with a rock, then with a board provided by Norton, until Maya gave up the struggle. James then shot Maya again, causing Maya to fall to the ground. James handed the gun to Norton, who cocked the hammer but did not pull the trigger, and handed the gun to Libberton. At this point, Maya

> was just going uh uh breathing really hard and rap-
> idly and [Libberton] put the gun about 10 inches
> from his head and pulled the trigger. [Maya] wasn't
> breathing anymore. A gurgling sound started coming

out. Steve didn't know what was going on. That son
of a bitch ain't dead yet. So [James] picked up a real
heavy rock, it was heavy because he barely put it up
and slammed it down on [Maya's] head.

. . . [T]hen [Libberton] picked up the same rock and
put it on his head. Then I picked up the same rock
and threw it on his head.

Once Maya was dead, James and Libberton dragged Maya's
body to the shaft, and Libberton threw him in. When the
group returned to the car, Norton stated, "[T]hey said,
[']Norton, you say one word to anybody, I mean anybody,
even Ralph, I'll kill you.['] . . . [Libberton] said, ['Y]ea,
you'll find your body right next to Juan.[']"

After giving this statement, Norton entered an undated plea
agreement providing that, if he testified against James and
Libberton in a manner "substantially consistent" with his
December 29 statement, the state would withdraw its request
to transfer Norton's case to adult court. Norton agreed to
admit to the allegations in a juvenile petition charging him
with first-degree murder, armed robbery, kidnapping, and
credit card fraud. On February 3, 1982, the state withdrew its
transfer request and Norton was ordered committed as a juve-
nile until he turned 18. *See Libberton*, 583 F.3d at 1156.

## B.  Procedural History

### 1.  Guilt Phase

James was charged with first-degree murder, aggravated
robbery, kidnapping, and theft. His trial began in September
1982. At trial, James conceded that he was present when
Maya was beaten at his trailer; that he drove Libberton, Maya,
and Norton to the mine; that he was present when Maya was
shot and beaten to death; and that he helped Libberton throw
Maya's body down the shaft. James's defense theory was that

he struck Maya only once, in self-defense, and participated in the murder only under duress exerted by Libberton, who forced him to cooperate at gunpoint. James's counsel, Terry Pillinger, chose this strategy even though Arizona law does not permit a duress defense to homicide. *See* ARIZ. REV. STAT. § 13-412(C). The trial court rejected Pillinger's request for a duress instruction, but Pillinger, undeterred, argued in closing that the jury should acquit James because he acted under duress.

In addition to the physical evidence, the state relied primarily on the testimony of McIntosh and Norton. McIntosh testified that James admitted the murder to him. According to McIntosh, James said that Norton had brought Maya to the trailer, accused Maya of sexually assaulting him, and asked James and Libberton to "waste" Maya. James and Libberton "beat the hell out of [Maya] for a little while," and James told McIntosh that he had split open a knuckle on his hand when he punched Maya in the face, breaking Maya's nose. McIntosh testified that when James recounted breaking Maya's nose, he "kind of laughed about it." James then told McIntosh that the group drove to the mine, where "they went out and shot [Maya] and beat on him for a while. [James] said [Maya] was kind of hard to kill. He said [Maya] just wouldn't die. So they were beating on him with clubs and dropping rocks on him and stuff like that. And he still wouldn't die, so they just kicked him off into the mine shaft . . . [A]fter they threw [Maya] in the mine shaft they kicked a bunch of rocks and debris on the guy so that he would be kind of buried, and they drove away." McIntosh testified that during the retelling, James "had a smile on his face."

Norton's testimony conformed with his December 29 statement in all relevant respects. On direct, Parker, the prosecutor who had taken the December 29 statement, elicited the following testimony:

> Q:  [Y]our attorney, Robert Wertsching and I and Detective Davis met with you; is that correct?

A:   Yes.

Q:   Now, you weren't offered any kind of plea agreement at that time, were you?

A:   No.

Q:   And I told you that I only want you to tell me the truth?

A:   Yes.

Q:   And you did talk to me at that time, did you not?

A:   Yes.

Q:   In fact you gave a statement?

A:   Yes.

Q:   And you substantially told us exactly what had happened to Juan Maya and what you told the jury again today; is that correct?

A:   Yes.

Q:   Then later, Mr. Norton, you entered into a plea agreement with the State upon the advice of your attorney; is that correct?

A:   Yes.

On cross, Pillinger elicited that Norton had reasons to lie, both to minimize his own culpability and to ensure treatment as a juvenile because he feared that he would be killed or sexually abused in adult custody. Pillinger also established that Norton would be released from juvenile detention when he

turned 18. On redirect, Norton repeated that he gave the December 29 statement and consented to testify against James and Libberton without any plea agreement in place. In closing, Parker argued that at the time of the December 29 statement, when Norton "talked to me with his defense attorney present [there were] no promises, nothing."

James testified in his own defense and attributed his participation in Maya's murder to duress. James testified that after Maya fled the trailer, James pursued him into the trailer park to "find the guy and bring him back and get him out of here so we didn't have any trouble." James surprised Maya by approaching him from behind, prompting Maya to swing and miss at James. James testified that he punched Maya once in self-defense, striking him in the tooth and bloodying his own knuckle. James then "helped [Maya] up because I knocked him down, and I explained to him what I wanted to do was help him get back to his car. . . . because we didn't want any trouble whatsoever."

James testified that he proposed to let Maya go, but that Libberton disagreed and led Maya back to the trailer, where Libberton held him at gunpoint while Norton beat and robbed him. Libberton then suggested that Maya's body could be concealed in the Salome mine. James testified that Libberton "knew that my father owned some mines in Salom[e] . . . because on the previous day there was a television show on, on the mines, . . . and I mentioned that my father owns some mines." James testified that he was "petrified" because Libberton was armed and because "he fights . . . [d]irty. He just didn't really fight. He just kills people." James protested, but Libberton "told me to sit down and shut up or he would shut me up." Libberton then "told me to get in the car and drive because I knew where the mines were."

James acknowledged that the group stopped for gas and cigarettes but testified that Norton, not he, paid. James also acknowledged that a police officer stopped the car on its way

to the mine. James testified that he was speeding in order to get caught, but that when he got out of the car, Libberton said, "Watch what you say and don't go too far past your door." James did not tell the police officer what was happening because the car window was open and Libberton, who was sitting in the backseat holding the gun on Maya, was within earshot. James explained that "Libberton was sitting right there with the gun where he could have very easily reached out and shot somebody. Most likely it would have been me." After the officer let James go, Libberton told James, "['D]on't try anything like that again.['] Because he knew I was trying to speed up in order to get pulled over."

Once the group arrived at the mine, James testified that Libberton marched Maya at gunpoint up the incline to the shaft, and that only Libberton and Norton shot and beat Maya. James conceded that he helped drag Maya's body into the shaft, but he said he did it because Libberton "told me if I didn't help him to drag the man into the mine shaft he and Norton were going to throw me in the mine shaft."

After about two and a half hours of deliberations, the jury found James guilty of first-degree murder and kidnapping, but not guilty of aggravated robbery and theft.

### 2.  New Trial Motion/Penalty Phase

The court scheduled the penalty phase trial to begin just over three weeks after the verdict. Arizona law then provided that a judge, not a jury, determined the existence of any aggravating or mitigating circumstances and decided whether to impose the death penalty. *See* ARIZ. REV. STAT. § 13-703(B).[1] In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court

---

[1]Arizona's capital sentencing statute has been substantially amended and recodified since James's sentencing. We refer to the version of the statute in effect at the time. *See* 1982 Ariz. Sess. Laws ch. 238, § 2 (codified at former ARIZ. REV. STAT. § 13-703).

held that this procedure violated a capital defendant's Sixth Amendment entitlement to "a jury determination of any fact on which the legislature conditions an increase in [his] maximum punishment." *Id.* at 589. However, the *Ring* rule does not apply retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

Two days after the verdict, Pillinger submitted a four-page memorandum arguing that no statutory aggravating circumstances applied but listing several mitigating circumstances. Pillinger argued that the applicable mitigating circumstances included James's age, *See* ARIZ. REV. STAT. § 13-703(G)(5); the fact that Norton testified to inflicting the fatal blow; the fact that James was under duress, *see id.* § 13-703(G)(2); the evidence in a pretrial competency report prepared by Dr. Maier Tuchler that James was under the influence of LSD at the time of the murder; the opinion of Dennis Watterson, James's former probation officer, that James "had been a model probationer"; and the evidence that James did not participate in the actual killing. Pillinger either abandoned or failed to substantiate each of these mitigating circumstances at the penalty phase trial.

Nine days before the penalty phase trial was to take place, Pillinger received a telephone call from Dr. Jack Potts, a psychiatrist for the Maricopa County Health Department who had treated James during his pretrial detention. Dr. Potts told Pillinger that James had been taking lithium since March 1982 to treat what Potts had diagnosed as cyclothymia, a form of bipolar disorder. Drs. Tuchler and Merton Berger, who conducted pretrial competency examinations of James, had not been made aware of the prescription for lithium or the diagnosis. Pillinger saw this as a smoking gun. He moved for a new trial on the ground that James's treatment with lithium, not disclosed to Pillinger by the state, deprived James of an insanity defense; interfered with the client-counsel relationship by masking James's otherwise psychotic mental state; tainted the competency evaluations by Drs. Tuchler and Berger; and

adversely affected James's demeanor during his trial and testimony. The trial court granted Pillinger's request to subpoena all of James's pretrial treatment records from the Maricopa County Sheriff's Office and Department of Health, as well as Pillinger's motion for fees to employ Tuchler to assist him in preparing a supplemental motion for a new trial. Pillinger's request did not contemplate using Tuchler to prepare any mitigation evidence related to James's mental health.

The parties stipulated that the penalty phase trial would be combined with the hearing on Pillinger's new trial motion "[s]o that . . . if a motion for new trial is not granted, the Court will be able to consider any evidence offered in these proceedings[,] whether in support of the Motion for New Trial or in support of mitigation[,] in connection with mitigation." The court conducted a combined new trial motion/penalty phase hearing that dealt almost exclusively with James's treatment with lithium. Pillinger called five witness: Jerry Ott, an "inmate classification counselor" with the Maricopa County Sheriff's Office who conducted about a dozen counseling sessions with James; Dr. Potts; Dr. Tuchler; Watterson; and James's adoptive mother Winnie.

Ott testified that James had been classified a "918" on intake. That designation meant "mentally disturbed." Ott testified that James was a suicide risk when he was first arrested, and in fact attempted suicide by ingesting 24 aspirin, after which his stomach was pumped. But Ott conceded that another inmate classification counselor had characterized James as "criminally sophisticated," and Ott's treatment notes indicate that James had "a pattern of using superficial suicide attempts to release his frustrations." When Pillinger asked Ott what he thought of James as a person, Ott responded, "I tr[y] not to put a value on it." In Ott's opinion, during the course of several months of counseling, James "developed some more positive relationships with some other inmates," and was at times "genuinely interested in making some positive changes." James could be rehabilitated "[i]f he chose to."

James reported some history of alcohol, cocaine, and LSD use to Ott, but Ott did not ask him whether he was intoxicated at the time of the murder. On cross, the state elicited Ott's belief that James cultivated the role of a victim. "[R]ather than accepting responsibility for his own behavior, . . . it's other people's fault that he is in jail." Ott's testimony was brief because he had a plane to catch.

Based on James's pretrial treatment records, Dr. Tuchler testified that James had been prescribed the antidepressant Tofranil, the antipsychotic Mellaril, and the antianxiety drug Librium, in addition to lithium. Tuchler testified that he was not aware that James was undergoing psychiatric treatment or taking lithium when he conducted his competency evaluation, but stated on cross that nothing he learned from reviewing James's records would have affected his conclusion that James was competent for trial. Tuchler confirmed that at the time of the evaluation, James stated that he had a long history of using mind-altering drugs including LSD, PCP, and marijuana, and that he had been high on LSD at the time of the murder. In Tuchler's opinion, James was telling the truth and LSD use "may have" compromised James's capacity to appreciate the wrongfulness of his conduct. However, Tuchler conceded that while James may have been "under the influence of some drugs" at the time of the murder, Tuchler "could not determine whether there was an alteration of [James's] mental state at that time. He had a good enough memory of the incidents for which he is charged."

Dr. Potts's direct testimony covered only the possible effects of lithium on James's demeanor during trial. On cross, the state asked Potts whether he had diagnosed James's mental condition, but Pillinger objected, arguing that he "didn't have [Potts] testify as to any psychiatric determination. Only as to the drugs and the possible effects." The court overruled Pillinger's objection, and Potts testified that he diagnosed James with "psycholothalmic [sic] personality disorder." Potts was likely referring to "cyclothymic" personality disorder,

which the court reporter rendered phonetically. Cyclothymia is a form of bipolar disorder characterized by chronic, fluctuating moods involving periods of hypomania and depression.

Watterson testified that in 1977, when James was 19 years old, he "was convicted of a burglary of his pastor's residence where he broke into the pastor's home and stole approximately $17 worth of loose change from a can." Watterson testified that James had "difficulties at home specifically with his father," and that he "attributed the burglary . . . to rebellion against [James's] father." Watterson reported that James served 10 weekends in jail and was a "good" probationer who completed his four-year term of supervision without serious incident. However, when Pillinger asked whether Watterson believed James could be rehabilitated, Watterson equivocated. "From what I have read about the offense it is a dangerous offense. [James] committed a murder. There is a kidnapping charge. I do not know about the substantive nature of what transpired during the trial. I honestly can't say whether he is rehabilitable or not."

Finally, James's adoptive mother Winnie gave extremely brief testimony. She explained that she and her husband Bradley adopted James when he was four and a half because "Steven had no one to take him. There was no place for him to go. His mother had given him away." Winnie testified that James "had been rejected many times" and "had been in other foster homes." Once James was adopted, however, Winnie testified that his life became normal and stable. She testified that James never had fits of rage or displayed violence, never threatened or mistreated anyone, and was kind to his pets. Asked whether James had a drug problem, Winnie testified that James "did drink beer. . . . Other than that I guess I was not very up on drugs, and I was not aware."

The Maricopa County Adult Probation Department prepared a Presentence Report ("PSR") upon which the court relied in reaching its sentencing decision. In an interview with

Officer Jane Santos, who wrote the PSR, James said that "he had taken a large quantity of LSD just prior to this incident in an attempt to commit suicide," and that "he was not fully aware of the events that occurred because of his diminished functioning as a result of the influence of LSD." James "attributed his actions to the fact that he was on drugs when [the murder] occurred as well as the fact that he was very depressed because his girl friend had recently left him." James stated that because of duress, drug use, and depression, "these were not normal circumstances and he was not behaving rationally under these conditions."

The PSR related that Winnie stated that James "had never demonstrated a propensity toward violent or vicious behavior." Winnie acknowledged that she and her husband "experienced some difficulty with [James] during his adolescence, that he always seemed to 'be in the wrong place at the wrong time.'" James's adoptive father Bradley agreed that James "was not a violent person and was always afraid of gangs." He stated that James "was under stress at the time of this incident" because James's "wife had left him the previous year, . . . . [James] had been to see his biological mother in California, which had proved to be a very upsetting experience, and . . . his most recent girl friend had left him just prior to this incident." Bradley "also noted [James's] unemployed status and the fact that he apparently had been using drugs."

The PSR related further that Jim Stepp, a childhood friend, stated that "he has never known [James] to demonstrate violence or initiate any fights. He opined that [James's] involvement in this offense must have been due to irrationality brought on by [James's] excessive drug use." Don Thorp, a cousin, stated that James "was always somewhat rebellious and refused to follow rules imposed on him by society. He noted that [James's] father was a very strict disciplinarian who, although he obviously loved [James] tremendously, did not often demonstrate this." Thorp attributed the murder to "immaturity as well as drug use."

The PSR presented a skeletal social history based only on information provided by James. The PSR reported that James's biological father "was a drug addict and was sentenced to prison when [James] was very young. . . . [James's biological] mother had too many children to support, consequently she gave up custody of him and his sister to the state where they were placed up for adoption." After a year and a half in foster care, James was adopted by Bradley and Winnie James, then in their 50s, who "provided [James] a good, stable middle class home in which he always felt loved and protected."

James stated that "he has always felt rather depressed and unhappy, with feelings of inability to cope with pressure." As a consequence, James reported, "he has attempted suicide approximately four times, primarily through deliberate car accidents. He also related several events during the recent past which he believes are significant. He stated that prior to this offense, he visited his natural mother for the first time, which he stated had a devastating effect on him. He also related that his wife divorced him after only a few months of marriage and he had tried to kill himself in a car accident as a result of severe depression brought on by this incident."

James described his short-lived marriage to Marna Hulgren, which ended "due to marital conflicts caused by his excessive drug usage. [James] stated that his ex-wife used to tell him she thought he was crazy." James described his substance abuse by admitting "frequent and excessive use of a variety of illicit substances since 1972, including LSD, PCP, heroin, [and] marijuana . . . . He claim[s] to have been addicted to cocaine during 1979 and 1980. He attributes his involvement in the instant offense partially to the fact that he was hallucinating and taking LSD on the night of the offense."

The PSR reported interviews with several of Maya's relatives, all of whom recommended that James receive the death penalty because of the cruelty of the murder and the grief that

it caused Maya's family. The PSR also related a recommendation of Detective Davis that James receive the death penalty because Maya "was killed by torture which occurred over a period of hours, . . . apparently suffered pain, and . . . this appears to have been a cold-blooded, cruel and senseless murder."

In summary, the PSR concluded that James

experienced disruptive and unstable circumstances until he was adopted by the James family at the age of four and a half. His acknowledged depressions and morosity in later years may be related to unresolved feelings of insecurity and/or anxiety as a result of early deprivation. He apparently received sufficient attention, love, and care from the James[es] from the age of five and they continued to be supportive of him. There is, however, some indication that he experienced an antagonistic relationship with his father during his adolescence and his prior criminal arrest was perceived as perhaps an unconscious attempt to defy his father and his beliefs. . . . [A]lthough [James] was twenty-three years old when the instant offense occurred, he was unemployed at the time and financially supported primarily by his parents, indicating that he had not yet learned to be responsible for himself or to rely on his own initiative to become independent of his parents. This may have contributed to feelings of inadequacy, powerlessness, anger, and depression. . . . It also seems reasonable that a great deal of peer pressure was involved in the commission of these offenses, but [James's] claim of having been threatened with death by the codefendants for refusal to participate seems questionable . . . . [I]t was [James] who chased [Maya] after he ran from the trailer and brought [Maya] back to the others, it was [James's] gun which was used to coerce [Maya], it was

> [James] who drove [Maya's] vehicle and provided a
> place to dispose of the body, and, by his own omis-
> sion, it was [James] who dragged [Maya's] body into
> the mine shaft. [James's] culpability in the execution
> of this offense seems primary.

The PSR recommended a death sentence.

One week after the evidentiary hearing, the trial court heard argument on and denied Pillinger's motion for a new trial. It then heard argument on the sentence. Pillinger jettisoned most of the arguments he had made in his pre-hearing memorandum and urged the court to find only two mitigating circumstances. Pillinger relied on the statutory mitigating circumstance that James's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired," Ariz. Rev. Stat. § 13-703(G)(1), and the non-statutory mitigating circumstance that James could be rehabilitated, *id.* § 13-703(G). With respect to diminished capacity, Pillinger relied entirely on Dr. Tuchler's testimony that James had reported LSD use before the murder. With respect to rehabilitation, which Pillinger billed as "most important," Pillinger argued that Watterson had described James as rehabilitable and that Ott had referred to James's progress "in his appreciation of himself and his role in society." In response, the state correctly pointed out that "there was no testimony by any of the investigating officers that [James] appeared to be under any kind of drugs . . . other than his own statement that he either had used PCP or LSD." The state also correctly pointed out that Pillinger had misrepresented Watterson's testimony: Watterson had expressed no opinion on James's prospects for rehabilitation. Pillinger conceded his mistake and abandoned that mitigating circumstance.

The trial court sentenced James to death. The court found two aggravating circumstances: James "committed the offense as consideration for the receipt, or in expectation of the

receipt, of anything of pecuniary value," ARIZ. REV. STAT. § 13-703(F)(5); and James "committed the offense in an especially heinous, cruel, or depraved manner," *id.* § 13-703(F)(6). The court found that the state had established the pecuniary gain aggravating circumstance because James participated in stealing Maya's wallet and car, and in using Maya's credit card to buy gas and cigarettes, and in attempting to obtain a cash advance. The court found the "heinous, cruel, or depraved" aggravating circumstance established because

> the victim in this case suffered prolonged and excruciating mental, physical and psychological pain and distress, and that such pain and distress were inflicted deliberately and sadistically. Several hours passed between the time [James] and his co-murderers formed the intent to kill the victim and the time that they did kill him. During this time the victim was viciously beaten all over his body, including his head, face and groin. He was taunted and his murder was openly and blithely discussed in his presence. Early in the evening, he attempted escape, and was caught by [James] and returned to [James's] home. His repeated pleas to be released in return for all his valuables were rejected. He was robbed of all possessions he had with him. He was held at gunpoint for hours. He was kidnapped and spent hours traveling to the scene of his death in his own automobile. After finally arriving at the scene of his murder in a remote, isolated desert area, he was shot, causing his clothing to catch on fire. He was then viciously beaten with fists, boards and rocks until finally he expired. The evidence shows that he had been beaten beyond recognition prior to his death. In short, the murder was committed in an especially cruel manner. . . .
>
> [T]his was a totally senseless murder. Even if the events of the evening began as the perpetrators now

claim, there was no reason for the killing other than the perpetrators' greed and their arrogation to themselves of the role of executioners to those whose sexual preferences they purport to decry. [James] carried out this murder in a depraved manner, indicating a total disregard of even minimal feelings of compassion for a fellow human being. The manner in which the killing was accomplished has already been detailed. Following the killing, [James] bragged about his role in it and of the difficulty he and the others had in finally making Juan Maya die. [James's] statements evidence no compassion or remorse and indicate he felt he was justified in killing someone whom he believed to be different than himself. The mode of disposing of the body itself demonstrates a certain callousness and depravity and disregard for the victim's family who might never have learned of the fate of Juan Maya, but for the later brazenness of [James] and his co-murderers.

The court rejected diminished capacity as a mitigating circumstance, finding that "[w]hile [James] later made a self-serving statement that he had drugs the night of the murder, the evidence is clear that his capacity was not impaired." Because the court found "no mitigating circumstances sufficiently substantial to call for leniency," Arizona law required the imposition of a death sentence. ARIZ. REV. STAT. § 13-703(E); *see also, e.g.*, *Robinson v. Schriro*, 595 F.3d 1086, 1094 (9th Cir.), *cert. denied*, 131 S. Ct. 566 (2010).

### 3.   Direct Appeal

On direct appeal, the Arizona Supreme Court affirmed. *See* ARIZ. REV. STAT. § 13-4031. As pertinent here, the court struck the pecuniary gain aggravating circumstance because the jury had acquitted James of aggravated robbery and theft. *James*, 685 P.2d at 1298. However, the court affirmed the heinous, cruel, or depraved aggravating circumstance, quoting

the trial court's factual findings and summarily stating that they were "correct." *Id.* at 1299. The court rejected the argument that James proved diminished capacity due to LSD intoxication, concluding that "[t]he evidence of drug ingestion was unrefuted but it was uncorroborated. The record reveals that James' capacity on the night of the crime was not impaired." *Id.* at 1300. The United States Supreme Court denied certiorari. *James v. Arizona*, 469 U.S. 990 (1984).

### 4.    State Postconviction and Federal Habeas

James filed numerous postconviction petitions. We discuss them only to the extent that they pertain to the claims now before us. In his first Petition for Postconviction Relief ("PCR"), filed in 1985, James argued that Pillinger provided ineffective assistance by failing adequately to investigate and present evidence of James's LSD intoxication at the time of the murder, and by failing to interview witnesses who could have testified to James's potential for rehabilitation. The Maricopa County Superior Court dismissed the claim as procedurally barred and denied James's request for an evidentiary hearing. The court cited Ariz. R. Crim. P. 32.2(a)(3), which at the time provided that relief could not be granted on any claim "[k]nowingly, voluntarily and intelligently not raised at trial, on appeal, or in any previous collateral proceeding." *See also* ARIZ. REV. STAT. § 13-4232(A)(3). The Arizona Supreme Court denied review.

In his second PCR, filed in 1991, James did not present an ineffective assistance of counsel claim as a freestanding basis for relief. However, in an attempt to circumvent the procedural bars to relief on claims finally adjudicated in a prior proceeding, ARIZ. REV. STAT. § 13-4232(A)(2); Ariz. R. Crim. P. 32.2(a)(2), or not raised in a prior proceeding, ARIZ. REV. STAT. § 13-4232(A)(3); Ariz. R. Crim. P. 32.2(a)(3), James argued that his trial, appellate, and first PCR counsel were all ineffective. The Maricopa County Superior Court dismissed the petition, finding that "no facts have been presented which

would rise to the level of a colorable [ineffective assistance of counsel] claim. . . . Additionally, the issue of ineffective assistance of counsel at the trial level and on appeal and in the first petition for post-conviction relief was presented in the first petition for post-conviction relief. This court is precluded from granting relief on this issue now." The Arizona Supreme Court denied review. The United States Supreme Court denied certiorari. *James v. Arizona*, 507 U.S. 928 (1993).

James filed a federal habeas petition in 1993. Based on the Wertsching affidavit, *see supra* pp. 2142-43, James raised claims under *Brady*, *Giglio*, and *Napue*. The district court dismissed James's habeas petition without prejudice so that he could exhaust his state remedies on this claim. James therefore filed a third PCR in state court in 1995, in which he raised several claims — including the three claims now before us. The Maricopa County Superior Court denied relief and again denied James's request for an evidentiary hearing. With respect to the *Brady*/*Giglio* claim, the court assumed that Wertsching's affidavit was true and that the state had entered a "secret agreement" to treat Norton as a juvenile before Norton gave his December 29 statement. The court denied relief on the rationale that any nondisclosure was not material. *See Giglio*, 405 U.S. at 154; *Brady*, 373 U.S. at 87. Referring to Norton's November 19 statement to Detective Davis and his November 26 statement to Detective Hackworth, the court wrote, "Prior to the time there was any agreement, Norton had already made statements to the police that incriminated [James]. These statements were made before he was represented by counsel. Therefore, his motive [to testify] was not based on the agreement. . . . Although the statements [Norton] made while being interrogated by the police were not necessarily consistent, the statements either implicated or connected [James] with the murder or were statements where Norton denied having knowledge of how the crime occurred." Moreover, the court determined that "[t]he existence of the agreement has little impeachment value. The defense had a copy of the plea agreement that was signed after Norton gave

his statement to the prosecutor. The agreement was introduced in evidence. Norton was cross-examined about the plea agreement. He was questioned about prior inconsistent statements. The jury knew Norton had a motive to cooperate with authorities." Because of the "overwhelming evidence" of James's guilt — including McIntosh's testimony that James bragged about the murder and James's role in driving the group to the mine — as well as the jury's rejection of James's duress defense, "[t]he outcome of the trial would not have been affected by knowledge of Norton's agreement."

With respect to the *Napue* claim, the court reached the identical conclusion — that any false testimony about the agreement was not material. *See Napue*, 360 U.S. at 271. Even assuming the existence of a "secret agreement," there was no reasonable likelihood that the false testimony affected the verdict or sentence due to "overwhelming independent evidence of [James's] guilt, including his confession to McIntosh and his own incredible testimony. Additionally, . . . the jury had substantial reason to question Norton's motives even without knowledge of the alleged agreement."

The court also determined that James's ineffective assistance of counsel claim remained procedurally barred. The first PCR court had held James's ineffective assistance claim precluded because James could have raised it on direct appeal. *See* Ariz. R. Crim. P. 32.2(a)(3). The third PCR court explained that "[t]o the extent that the claims were precluded in the first petition, they were precluded in the second, and are precluded now in the third petition. . . . Those issues were and are precluded under Rule 32.2(a)(3). That is the law of the case." The court then added an alternative procedural bar. Rule 32.2(a)(3) prevented consideration of James's ineffective assistance of counsel claim because James "waived any such argument by failing to cite in his second petition specific errors of counsel and he failed to indicate how he was actually prejudiced by any alleged errors. . . . [James] could have raised his claims in the second petition, but failed to do so."

Finally, after addressing each of James's claims in detail, the third PCR court in a paragraph at the end of its opinion found that "[a]s to the entire petition . . . there are no genuine or material issues of fact or law that are in dispute that would entitle [James] to an evidentiary hearing. No colorable claims have been made." The Arizona Supreme Court denied James's petition for review in a summary order.

James filed this federal habeas petition in 2000. He raised 33 claims for relief and expanded the record by presenting 82 exhibits, most of them related to his claim that Pillinger provided ineffective assistance at the penalty phase by failing to investigate and present mitigating evidence. *See* Rule 7 of the Rules Governing § 2254 Cases. James also sought an evidentiary hearing. Without conducting a hearing, the district court denied relief and denied a subsequent motion to amend the judgment. *See* Fed. R. Civ. P. 59(e). The court granted a certificate of appealability on the three claims now before us, and James appealed.

## II.    Standard of Review

We review the denial of a habeas petition *de novo*. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010). We review denials of evidentiary hearing requests and Rule 59(e) motions for an abuse of discretion. *Id.*; *Duarte v. Bardales*, 526 F.3d 563, 567 (9th Cir. 2008).

Because James filed this habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). We may not grant habeas relief with respect to any claim that was adjudicated on the merits by the Arizona courts

unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Because the Arizona Supreme Court denied review in a summary order, we " 'look through' that opinion to the last reasoned decision" on James's current federal claims, that of the Superior Court denying James's third PCR. *Hurles v. Ryan*, 650 F.3d 1301, 1311 (9th Cir. 2011) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991)). The third PCR court rejected James's *Brady/Giglio* and *Napue* claims on the merits, so § 2254(d) circumscribes our review of those claims. Section 2254(d) imposes a standard that is "difficult to meet." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents," but "goes no farther." *Id.* Consequently, "[a]s a condition for obtaining habeas corpus from a federal court," James must show that the third PCR court's rejection of his *Brady/Giglio* and *Napue* claims was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

However, the third PCR court relied on a procedural bar to dismiss James's ineffective assistance of counsel claim. That claim was not "adjudicated on the merits in State court proceedings," and 28 U.S.C. § 2254(d) therefore does not apply. Where a state court does not reach the merits of a federal claim, but instead relies on a procedural bar later held inadequate to foreclose federal habeas review, we review *de novo*. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002);

*see also Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009) (where state court relies on inadequate procedural bar and does not address merits, "federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.' Instead, the claim is reviewed *de novo*." (quoting 28 U.S.C. § 2254(d)).

The state has long agreed that the third PCR court dismissed James's ineffective assistance of counsel claim as procedurally barred. However, in a petition for rehearing before this court, the state argued — for the first time — that the third PCR court "also" rejected the claim on the merits in a paragraph at the end of its opinion. We quoted from that paragraph above. The state contends that this paragraph is an "alternative ruling on the merits" by the third PCR court. If this were so, the state court's ruling on this claim would be subject to deferential review under AEDPA. *See Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009) ("[W]e agree with our sister circuits that an alternative merits determination to a procedural bar ruling is entitled to AEDPA deference.").

The state's late-raised argument is easily resolved. Beginning with its opposition to James's petition for review in 1999, the state has consistently maintained that the third PCR court denied James's ineffective assistance claim on procedural grounds alone. The state similarly characterized the third PCR court's decision in its opposition to James's federal habeas petition in 2001. The district court reviewed James's ineffective assistance of counsel claim *de novo* because it found that the third PCR court relied on an inadequate procedural bar and "did not pass on the merits" of the claim. Notably, the state did not contest this aspect of the district court's holding and did not raise this issue in its original brief before this court. Moreover, this court at the outset of oral argument asserted its understanding that the third PCR court had denied James's ineffective assistance of counsel claim on procedural grounds and not on the merits. Counsel for the state did not

object to this understanding during oral argument and never suggested that the third PCR court in fact ruled on the merits of the claim. As a result, the state has waived any contention that the third PCR court adjudicated the merits of James's ineffective assistance of counsel claim. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009); *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008).

Even if the issue were not waived, the state's argument would fail. As our sister circuits have held, where a state court primarily relies on a procedural bar to deny a habeas claim, it only receives AEDPA deference for an alternative holding that actually reaches and resolves the merits of the claim. *See Stephens*, 570 F.3d at 206, 208; *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (withholding AEDPA deference from a state court's contingent observation that "if the merits were reached, the result would be the same"). For example, in *Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008), the Sixth Circuit extended AEDPA deference to a state court's alternative ruling that specifically addressed the merits of the petitioner's ineffective assistance of counsel claim and held that the petitioner had failed to satisfy either prong of *Strickland. See State v. Brooks*, No. 73729, 1999 WL 401655, at *6-7 (Ohio Ct. App. June 17, 1999). Here, in contrast, the third PCR court never discussed or analyzed the merits of James's ineffective assistance of counsel claim. In its 38-page opinion, the court examined each of the claims raised in James's third PCR under a separate heading and explained in detail why it denied each claim. The court denied most of the claims — including James's *Brady/Giglio* and *Napue* claims — on their merits alone, and two alternatively on their merits and procedural grounds. However, unlike with every other claim that it considered, the court never discussed the merits of James's ineffective assistance of counsel claim. Instead, it relied solely on procedural grounds to deny the claim. A comparison of the court's discussion of this claim with its discussion of the others leaves little doubt that it denied the claim as procedurally barred without adjudicating the merits.

The state points to the concluding paragraph at the end of the third PCR court's opinion as a purported alternative merits ruling. However, this paragraph did not present any "alternative" bases for the court's prior rulings; the court had already provided detailed reasons why it denied each claim. In its merits analysis of the first three claims, the third PCR court had noted that James failed to present colorable claims warranting an evidentiary hearing. However, the court did not discuss the possibility of further evidentiary development when it subsequently denied several other claims on the merits. Viewed properly in this context, the concluding paragraph simply clarified that no evidentiary hearing was necessary for any of the claims that the third PCR court had reviewed on the merits.

Under *Richter*, 131 S. Ct. at 784, a state court decision need not articulate the precise reasons for denying relief in order to qualify as an adjudication on the merits under AEDPA. However, *Richter* expressly limited its holding to instances where the state court "did not say it was denying the claim for any other reason." *Id.* The Supreme Court explained:

> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits *in the absence of any indication or state-law procedural principles to the contrary. . . .* The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely.

*Id.* at 784-85 (emphasis added). Here, the third PCR court expressly stated that it denied James's ineffective assistance of counsel claim as procedurally barred. As a result, we need not presume that the brief paragraph at the end of its opinion somehow adjudicated the claim on the merits.

In sum, we find that the third PCR court denied James's ineffective assistance of counsel claim as procedurally barred

without adjudicating the merits. Because we find the state procedural bar inadequate to foreclose federal review, we review *de novo*.

The third PCR court's reliance on a procedural bar to dismiss James's ineffective assistance of counsel claim without reaching the merits has an additional consequence. James is not subject to the rule announced in *Cullen v. Pinholster* that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). *Pinholster* acknowledged that a habeas petitioner who raises a claim that was not adjudicated on the merits in state court, and is therefore not subject to § 2254(d), may present new evidence in federal court, as long as he satisfies the requirements of § 2254(e). *See* 131 S. Ct. at 1401 ("[N]ot all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.' At a minimum, therefore, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court."). Because *Pinholster* does not apply, we may consider the new evidence developed by James's federal habeas counsel and presented to the district court, pursuant to his habeas petition and Rule 59(e) motion, in determining whether Pillinger provided ineffective assistance.

At oral argument, counsel for the state argued — again for the first time in nearly 11 years of federal court litigation — that even if James's ineffective assistance of counsel claim was not "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), *de novo* review is nonetheless inappropriate. The state's argument was less than pellucid, but counsel appeared to contend that even if § 2254(d) does not apply, we may not grant habeas relief on the basis of evidence not presented to the state court unless that evidence "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would

have found the applicant guilty of the underlying offense." *Id.* § 2254(e)(2)(B). Counsel suggested that we apply a "*Jackson* [*v. Virginia*, 443 U.S. 307 (1979),]" standard and deny relief unless the evidence that James presented for the first time on federal habeas was so persuasive that no reasonable sentencer presented with that evidence during the penalty phase could have sentenced James to death.

Once again, the state's late-raised argument is easily resolved. When a party raises a distinct argument for the first time at oral argument before us, not having briefed it at all, we normally consider that argument waived. *See Clem*, 566 F.3d at 1182; *Butler*, 528 F.3d at 642. Even if we were to consider the state's argument on the merits, we would reject it. Section 2254(e)(2)(B), the only authority cited for the state's position, "imposes a limitation on the discretion of federal habeas courts to take new evidence in an evidentiary hearing." *Pinholster*, 131 S. Ct. at 1400-01. It applies by its terms only to a federal habeas petitioner who "has failed to develop the factual basis of a claim in State court." But "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor (Michael Williams)*, 529 U.S. 420, 432 (2000). At oral argument, the state conceded that James was diligent, as it had to. By requesting evidentiary hearings on his ineffective assistance of counsel claim before the first and third PCR courts, James demonstrated the necessary diligence. *Id.* at 437; *Stanley*, 598 F.3d at 624 & n.8; *Estrada v. Scribner*, 512 F.3d 1227, 1235 n.7 (9th Cir. 2008).

Finally, the state's position contradicts clear Supreme Court authority indicating that when a state court "d[oes] not reach the merits" of a federal claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA . . . . Instead, the claim is reviewed *de novo*." *Cone*, 129 S. Ct. at 1784; *see Porter v. McCollum*, 130 S. Ct. 447, 452 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

### III. Discussion

#### A. *Brady/Giglio* and *Napue* Claims

**[1]** James's *Brady/Giglio* and *Napue* claims fail for the reasons we previously articulated in Libberton's case. *Libberton*, 583 F.3d at 1162-64. In his federal habeas petition, Libberton presented factually and legally identical *Brady/Giglio* and *Napue* claims based on the state's "secret agreement" with Norton. Libberton relied on the Wertsching affidavit procured by James's habeas counsel to substantiate these claims. *Id.* at 1158-59, 1162-64. The same police reports recording Norton's statements were provided to James and Libberton. Norton's trial testimony, including his responses to Parker's questions regarding a plea agreement, was the same in all relevant respects. In both cases, the same prosecutor, Parker, told the jury that no deal preceded Norton's December 29 statement. James and Libberton both rely on the Wertsching affidavit to prove the existence of the oral plea agreement. Finally, the state postconviction courts in both cases adopted the same materiality rationale: assuming the existence of an oral plea agreement, neither nondisclosure of nor the state's acquiescence in Norton's false testimony was material because Norton's testimony could have been corroborated by his November 26 statement to Hackworth, which preceded any plea agreement. Moreover, Norton was adequately impeached with evidence of the plea agreement that was disclosed. Finally, AEDPA's deferential standard of review applied to Libberton's claims, as it does to James's.

**[2]** We have already rejected Libberton's claims in a published opinion. *Id.* at 1162-64. With respect to the *Brady/Giglio* claim, we agreed with the state court's conclusion that "the agreement, if it existed, was not material." *Id.* at 1162. We wrote:

> Unlike in *Giglio*, the key witness in this case, Norton, had already given a deeply incriminating state-

ment to Detective Hackworth before the alleged deal was entered into. Therefore, the government could have pointed to a statement untainted by any secret deal, if such a deal existed, in order to corroborate Norton's trial testimony. Unlike in *Giglio*, where the jury was unaware of *any* deal with prosecutors, the jury in Libberton's case was well aware that Norton had reached a plea agreement with prosecutors whereby he agreed to testify in exchange for being prosecuted as a minor. The question is not whether Norton made a deal with prosecutors, but only when he did so. Given the availability of Norton's earlier statement to Hackworth as corroboration of his trial testimony, it is unlikely that the jury would have reached a different conclusion as to Libberton's guilt even if it had known of the alleged oral agreement.

*Id.* at 1163-64 (emphasis in original).

[3] We reached a similar conclusion with respect to the *Napue* claim:

While the precise materiality standard under *Napue* is slightly different than under *Giglio*, the result in this case is the same. Instead of asking whether there was a "reasonable probability" of a different outcome, a *Napue* violation requires a court to ask whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc). For the reasons explained above, we conclude under AEDPA that Libberton's *Napue* argument does not succeed.

*Id.* at 1164. James has not identified any distinction between his case and Libberton's, nor do we see one. Consequently, we reach the same conclusion as the *Libberton* panel. The third PCR court did not unreasonably apply *Brady*, *Giglio*, or

*Napue* by determining that, even if a secret agreement existed, neither the state's failure to disclose the agreement nor its failure to correct Norton's false testimony denying the existence of such an agreement was material.

## B.    Ineffective Assistance of Counsel

### 1.    Procedural Default

**[4]** Before we turn to the merits of James's claim of ineffective assistance of counsel, we consider the state's argument that the claim is procedurally defaulted. A state prisoner procedurally defaults a claim, and federal habeas review is barred, "when a state court decline[s] to address a prisoner's federal claims because the prisoner ha[s] failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977)). To qualify as an adequate procedural ground, a state rule must be "firmly established and regularly followed," though a "discretionary state procedural rule" may satisfy this standard. *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (quoting *Beard v. Kindler*, 130 S. Ct. 612, 617 (2009)). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). Relying on *Lambright v. Stewart*, 241 F.3d 1201, 1203-04 (9th Cir. 2001), the district court concluded that there had been no procedural default because "[a]t the time of [James's] alleged default, Arizona did not have a firmly established procedural rule precluding as waived [ineffective assistance of counsel] claims asserted in a PCR petition filed after the conclusion of the direct appeal."

We agree. In *Lambright*, which is directly on point, we concluded that in 1985, when James filed his first PCR, there

was no firmly established rule requiring a defendant to raise on direct appeal an ineffective assistance of counsel claim that relied on extra-record evidence. 241 F.3d at 1203-04. To the contrary, we concluded that Arizona law then *prohibited* defendants from raising on direct appeal claims based on extra-record evidence, and mandated instead that defendants raise such claims in PCRs. *Id.* In *Lambright*, the habeas petitioner claimed in his first PCR that trial counsel "failed to investigate or present evidence of his mental disability and social history." *Id.* at 1204. Because of the nature of this ineffective assistance claim, "neither the evidence of counsel's deficiencies nor of the prejudice caused therefrom appeared in the trial record." *Id.* We therefore held that

> [s]ince [the petitioner's] ineffective assistance of counsel claim required factual development, Rule 32.2 did not clearly require that he raise it on appeal. In fact, Arizona's procedural rules required that he wait until state postconviction proceedings to raise it. Thus, the procedural default in this case is inadequate to bar federal review.

*Id.*

The state points to the alternative ruling of the third PCR court that James waived his ineffective assistance of counsel claim "by failing to cite in his second [PCR] specific errors of counsel and he failed to indicate how he was actually prejudiced by any alleged errors. . . . [James] could have raised his claims in the second [PCR], but failed to do so." The state's position, like that of the third PCR court, is self-contradictory. The first PCR court determined that James's ineffective assistance of counsel claim was "clearly precluded" by Rule 32.2(a)(3). The second PCR court stated that because James's ineffective assistance of counsel claim "was presented in the first petition for post-conviction relief," it was "precluded from granting relief on this issue now." The

third PCR court agreed that this finding of preclusion constituted "the law of the case."

Preclusion and waiver are mutually exclusive procedural bars. *See, e.g.*, *Cone*, 129 S. Ct. at 1781 (describing preclusion and waiver as "contradictory" grounds for barring state postconviction review of a federal claim); *Lambright*, 241 F.3d at 1205 (same); *Ceja v. Stewart*, 97 F.3d 1246, 1252-53 (9th Cir. 1996) (noting that preclusion and waiver are inconsistent). A claim cannot be waived if it cannot be raised, and a precluded claim cannot be raised. The first PCR court determined that because James had failed to advance any ineffective assistance of counsel claim on direct appeal, Rule 32.2(a)(3) prevented any postconviction court from granting relief. The second and third PCR courts determined that James was precluded from raising such a claim, because it had been decided in the first PCR petition. James cannot now be charged with having waived in his second PCR a claim that had already been resolved against him, on procedural grounds, in the first.

## 2.   Deficient Performance

**[5]**  To establish that counsel provided constitutionally ineffective assistance, a defendant must demonstrate both deficient performance and prejudice. *Strickland*, 466 U.S. at 687. To establish deficient performance, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The defendant bears the burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The district court concluded, and the state does not dispute, that Pillinger's performance was "clearly deficient." We agree. Pillinger's performance fell far below prevailing professional norms applicable to capital defense counsel in 1982.

**[6]** First, Pillinger failed to conduct even the most basic investigation of James's social history. It is "unquestioned" that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background." *Porter*, 130 S. Ct. at 452 (quoting *Williams v. Taylor (Terry Williams)*, 529 U.S. 362, 396 (2000)); *see also Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 522-23. This obligation was clear at the time of James's trial. *See Hamilton v. Ayers*, 583 F.3d 1100, 1130 (9th Cir. 2009) (in 1982, it was "undisputed that counsel was required to obtain the type of available information that a social history report would contain, such as family and social background and mental health"); *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (en banc) (in 1982, professional standards then in effect "clearly described the . . . 'duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction' ") (quoting ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980)); *id.* at 630 ("[T]he investigation should include inquiries into social background and evidence of family abuse.").

**[7]** There were obvious indications that James had suffered emotional and psychological trauma during his childhood. Dr. Tuchler's pretrial competency report referred to James's "disturbed childhood" and his adoption. The PSR described James's biological father Lester Pannell as a drug addict who was incarcerated during James's childhood; stated that James's biological mother Lora Pannell could not care for her children; and reported that James spent one and one-half years in foster care before his adoption at age four. Nonetheless, as the district court determined from a review of his billing records, Pillinger "failed to take any steps to investigate and present evidence of [James's] life history, including consulting with [James], his adoptive parents, his biological family, and others who knew him." Pillinger also failed to obtain readily available educational records that would have demonstrated James's subaverage academic and intellectual func-

tioning, as well as his behavioral and social problems. This was deficient performance. *See Porter*, 130 S. Ct. at 453 (deficient performance where counsel "had only one short meeting with [the defendant] regarding the penalty phase" and "did not . . . interview any members of [the defendant's] family" or obtain school records); *Wiggins*, 539 U.S. at 524-25 (deficient performance where counsel "abandoned their investigation of [the defendant's] background after having acquired only a rudimentary knowledge of his history from a narrow set of sources" that nonetheless revealed that "[the defendant's] mother was a chronic alcoholic; [and the defendant] was shuttled from foster home to foster home and displayed some emotional difficulties while there"); *Summerlin*, 427 F.3d at 631 (deficient performance where counsel "conducted no investigation of [the defendant's] family and social history" and "did not speak with [the defendant's] family or friends").

[8] Second, Pillinger failed to investigate James's mental health. The duty to investigate a capital defendant's background for mitigating evidence includes the duty to assess his mental health. In *Summerlin*, where the underlying trial took place in Arizona in 1982, we made this point clearly: "[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Id.* at 632 (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995)) (alteration in original); *see also Porter*, 130 S. Ct. at 453.

[9] Pillinger possessed evidence of James's mental illness that should have prompted further investigation. Dr. Tuchler's report stated that James had attempted suicide several times by intentionally crashing cars at high speeds, and Tuchler observed a slash on James's wrist that revealed "a rather typical suicidal gesture." Dr. Berger's pretrial competency report also noted a history of suicide attempts. Pillinger also knew

that James took lithium and underwent psychiatric care during his pretrial detention. *See Hamilton*, 583 F.3d at 1117 (where "counsel was aware that [the defendant] tried to commit suicide in prison . . . and that he was taking anti-depressant medication at the time of trial," counsel "should have retained a mental health expert and provided the expert with the information needed to form an accurate profile of [the defendant's] mental health"). Pillinger was sufficiently aware of the need to investigate James's mental health that he moved for the appointment of a forensic psychiatrist in July 1982. The court denied the motion but offered to order an additional examination by either Dr. Tuchler or Dr. Berger. Pillinger declined. When Pillinger did obtain a court order securing Tuchler's assistance to review James's treatment records before the penalty phase, Pillinger used Tuchler only to prepare and argue his new trial motion that dealt with the effects of lithium on James's demeanor at trial. Likewise, Pillinger questioned Dr. Potts on direct only about the effects of lithium on James's trial conduct and objected when the state asked Potts for a psychiatric diagnosis on cross.

**[10]** Third, Pillinger failed to investigate James's history of drug abuse. This component of a competent mitigation investigation is well-established. *See Rompilla*, 545 U.S. at 382 (deficient performance where counsel "did not look for evidence of a history of dependence on alcohol that might have extenuating significance"); *Correll v. Ryan*, 539 F.3d 938, 944 (9th Cir. 2008) (describing drug abuse history as "classic mitigation evidence"); *Summerlin*, 427 F.3d at 630 ("The defendant's history of drug and alcohol abuse should also be investigated."). Again, there were clear cues that James had a history of polysubstance abuse and dependency. James reported a history of using marijuana, cocaine, and LSD to Dr. Tuchler and to several clinicians at the Maricopa County Department of Health. In his December 29 statement, Norton said that on the night of the murder, James had been drinking vodka and smoking marijuana, was "feeling good" and "staggered a little bit when he went to the restroom." Pillinger

argued James's diminished capacity because of LSD intoxication at the time of the offense as a mitigating circumstance. But he failed to appreciate that chronic drug abuse itself evinces, as well as exacerbates, serious mental illness. *See, e.g.*, *Jones v. Ryan*, 583 F.3d 626, 642 (9th Cir. 2009) (ineffective assistance where counsel "did present evidence to the court regarding [the defendant's] drug induced impairment on the night of the murders, but he did not take the next critical step: to explain why [the defendant] had pursued a life of substance abuse"), *vacated on other grounds*, 131 S. Ct. 2091 (2011) (summarily vacating "for further consideration in light of *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)"); *Correll*, 539 F.3d at 952 (regular use of marijuana, LSD, and amphetamines is "behavior that can be characterized as self-medication for the everyday trauma of [the defendant's] life and for the mental health illnesses that were later diagnosed").

**[11]** Pillinger's deficient investigation and failure to prepare a mitigation case adversely affected the penalty phase trial. Pillinger's lack of familiarity with James's social history meant that he could elicit from James's adoptive mother Winnie only banal observations such as, for example, James was kind to his pets and kept a clean trailer. Winnie was not asked to describe the residual emotional and psychological handicaps that plagued James long after his adoption. Because Pillinger did not discuss Winnie's testimony with her beforehand, Winnie disclaimed on the stand any knowledge of James's chronic drug abuse. In a later interview with James's postconviction counsel, Winnie said that she was aware of James's drug use, but did not testify to it because Pillinger had not asked her to do so, and that she mistakenly assumed that if she "said anything bad about Steven it would hurt his case." Pillinger's failure to prepare Ott and Watterson, and his decision not to put them on the stand, resulted in the harmful concessions that Ott "tried not to put a value on" James's worth as a person, and that Watterson "c[ould]n't say whether [James] is rehabilitable or not." Pillinger's ignorance of James's family background, his pretrial treatment history,

and his mental illnesses deprived Dr. Potts of the information necessary to present a psychiatric diagnosis of cyclothymia as a mitigating circumstance.

### 3.    Prejudice

**[12]** Under *Strickland*, counsel's deficient performance prejudices a defendant if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "To assess that probability, we consider 'the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweig[h] it against the evidence in aggravation.' " *Porter*, 130 S. Ct. at 453-54 (quoting *Terry Williams*, 529 U.S. at 397-398) (alteration in original). The measure of prejudice is "the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Hovey v. Ayers*, 458 F.3d 892, 929 (9th Cir. 2006) (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004)). A "reasonable probability" is "less than the preponderance more-likely-than-not standard." *Summerlin*, 427 F.3d at 643. Rather, it is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[I]t is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll*, 539 F.3d at 951-52; *see also Rompilla*, 545 U.S. at 393.

**[13]** In comparison to the meager mitigation evidence set before the sentencing judge at the penalty phase — most of which came from the PSR, not Pillinger — James's federal habeas counsel developed a detailed picture of James's troubled childhood, his mental illness, and his downward spiral of depression and drug abuse in the year before Maya's murder. Such a portrait, attentive to James's "character and record," as well as the "possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind," is a "con-

stitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *see also Eddings v. Oklahoma*, 455 U.S. 104, 111-12 & n.7 (1982). We summarize that portrait.

James was born in 1958 in Los Angeles. James's mother Lora Pannell was a teenage mother with a seventh-grade education. Lora had her first child as a teenager, and had five children by three different fathers by the age of 23. Lora gave birth to James, her second child, when she was 19 years old. James's father Lester Pannell was a lifelong heroin addict and petty criminal with a tenth-grade education who was in and out of jail during James's early childhood. Thomas Smith, a friend of Lester's, declared that he and Lester "supported our heroin addiction by illegal activities," including burglaries and car break-ins. Smith declared that Lester "could be violent if anyone interfered with us when we were stealing stuff. He did whatever was necessary to get what he was after to support his habit."

Lester neglected the children from his first marriage, as well as the children he had with Lora. According to Lora, Lester "had no interest in his children. The only things he really cared about were his first wife (who was in prison) and getting high on heroin." When Lester married Lora he was still married to his first wife, but Lora did not know that. Smith declared that Lester "wasn't any good at being a father because it got in the way of his drug addiction." Lester shot heroin in front of James. Lester was also a violent alcoholic who physically abused Lora, beating her if he thought the house was messy. Thomas Blackman, who met Lester in a substance rehabilitation program in 1974, declared that Lester was "a vicious and hard-hearted man" who "had no feeling for others, usually no affect, and could not bond with the people around him." In Blackman's view, Lester "had no interest in his own children. He had never bonded with any of them and never expressed even the slightest interest in their well-being. He did not care about them at all."

Lora received welfare but moved her family frequently because she could not afford rent. At one point, Lora and Lester lived with James in a shack in Tujunga, California. When he visited, Lester's brother Donald slept on the porch because there was not enough room inside. At another point, Lora and Lester lived in a house basement in Tujunga with exposed pipes, a single bed, and "not much else," according to Smith. Because of the family's poverty, Smith declared that "[i]t was a struggle . . . to put food on the table, or to provide anything at all for the babies." Lora verbally abused her children, but also left them alone much of the time.

Lester left Lora when James was two or three years old. After Lester moved out, Jerry Isgrigg Sr. moved in and Lora soon gave birth to their son, Jerry Jr. Isgrigg was an alcoholic who physically abused Lora and the children. Isgrigg put alcohol in the milk bottle of his infant son, Jerry Jr., and beat him "very hard and often, usually when he was drinking or drunk," according to Jerry Jr.

Lora Pannell's family has a significant history of mental illness characterized by violent episodes. Roxann Hallquist, James's full sister, declared that their mother "was mentally ill. I never saw her happy. . . . I believe she is bi-polar." Lora was institutionalized at least twice. Lora's mother and grandmother suffered from mental illness, with the latter institutionalized. Lora's sister Diane was diagnosed with schizophrenia and committed to a mental hospital between the ages of 10 and 14. As an adult, Diane struck one of Lora's later husbands with a brick. Lora's brother Norman Osteen Sr. was schizophrenic, often homeless, and once broke the jaw of an ex-wife. Lora's son Jerry Jr., James's half-brother, has attempted suicide several times. He is illiterate and an alcoholic, and has been homeless for much of his life. Lora's daughter Donna, James's full sister, suffers from bipolar disorder.

Norman Osteen Sr., James's uncle, sexually abused several children, including his children Debbie and Norman Jr., as

well as Jerry Isgrigg Jr. Family members referred to him as "Chester the Molester." Norman Jr. declared that Norman Sr. sexually abused him beginning at age three or four, and that Norman Sr. admitted abusing other children. According to Hallquist, Norman Sr. "prostituted his daughter for rent money. [He] also molested . . . Jerry [Jr.] as a child." Although there is no direct evidence that Norman Sr. abused James, Hallquist declared that Norman Sr. was a "frequent visitor" to Lora's home while James lived there. Norman Sr.'s father Samuel Osteen, James's grandfather, who shared with his son a history of sexually abusing children, was also a "regular visitor" to Lora's home while James lived there, according to Jerry Jr. Hallquist declared that Lora "always needed to be with abusive, alcoholic men," and took no action when Hallquist reported that one such man had "done something bad" to her. Likewise, Lora allowed Norman Sr. to continue visiting her home even after Lora learned that he was molesting Jerry Jr. James's habeas counsel located Norman Sr., who lives in a retirement home in Grand Rapids, Michigan, but the district court denied counsel's request for funds for an investigator to travel to interview him.

Lora said she had difficulty raising James because he was "in constant motion, climbing into things, always needing her attention." James "cried a lot" and screamed whenever Lora was out of sight. Because of his neediness, Lora regarded James as a "brat." On one occasion, Lora became so frustrated with James that she "wanted to kill him. . . . I put a pillow over his face, but I stopped myself when I realized what I was doing."

Some time after the birth of Jerry Jr. in 1962, all of Lora's children — Pam, Steven, Roxann, Donna, and Jerry Jr. — were removed from her custody by the state of California. Roxann Hallquist declared that "all of [Lora's] children (including me) were removed from her home by the state." Tacla Machesney, Donna's adoptive sister, declared that "[t]he authorities were putting pressure on Lora to have some

of her children adopted because she was having babies virtually every year . . . and was not capable of caring for all of them." The district court denied habeas counsel's request to subpoena relevant records maintained by the Los Angeles County Department of Children and Family Services.

James lived in an adoption center in Los Angeles and in various area foster homes for six to nine months. Lora ultimately gave James, then four, and Donna, then an infant, up for adoption. Lora kept Pam, Roxann, and Jerry Jr. Donna was adopted by the Pool family. When Donna was adopted she had a broken nose and collarbone. Her clothes were soiled and too big for her. Machesney declared that while they were still under Lora's care, Pam, Roxann, and Donna "were obviously neglected and very needy. Their hair was uncombed and dirty. Their clothes were too old and too big for them, apparently hand-me-downs. They wore sandals that had nails coming through the bottom." Even after her adoption, Donna "was developmentally delayed" and experienced a "troubled life in her adolescence . . . . She became a drug addict, she married a man who was both an addict and an alcoholic, she is sometimes homeless."

Initially, the White family adopted James, but soon determined that they could not handle James's hyperactivity, so their friends Bradley and Winnie James agreed to adopt James instead. James was four years old. Bradley and Winnie James were significantly older than most parents of a young child. Winnie conceded that the couple was unprepared to raise a child with emotional problems like James's. Bradley and Winnie, Machesney declared, "were religious, very strict, older, and had never had children of their own." They lacked "the experience to deal with a child like Steven, who came from such an unstable environment, with a mother who had neglected him and the experience of going back and forth into foster homes."

Bradley was very strict and whipped James when he misbehaved. On one occasion, Bradley whipped James so severely

with a rope that he raised bloody welts all over James's back. Bradley tried to teach James to be tough. Bradley was "very stern, a man who could be rigid. Brad loved Steven, but it was not easy for him to show that love, and Steven rebelled," according to one of Winnie's cousins. Winnie stated in an interview that James worshiped Bradley when he was growing up, even though Bradley was very strict with him and would whip him when he acted out.

According to his pastor, Rev. Richard Jackson, James was "on the edge," undisciplined, and difficult for his adoptive parents to control, even as a young child. Winnie stated that James was emotionally troubled from the moment he entered her home. After the adoption, Winnie quickly appreciated that James was going to be very difficult to raise because of his short attention span and his rebelliousness. She would often receive calls from his elementary school teachers because he disrupted class to get attention. Winnie said, "Steven was a problem from day one. I don't think my husband and I were equipped to handle the situation." Rev. Jackson believed that James's "bent, his trouble, his disturbance, was something from infancy, from the beginning of his life. . . . I don't think that he had the chances as a youngster, before they adopted him, and he had a temperament set before they adopted him."

James was taking several unidentified medications when Bradley and Winnie adopted him, but at Bradley's insistence those medications were discontinued. James demonstrated several signs of early childhood trauma. He wet his bed unless Bradley or Winnie slept in his bed to comfort him, feared walking down a dark hallway at night to use the bathroom, and had anxiety about being abandoned. Winnie recalled that when couples would visit, James asked if he was going home with them. James never had psychiatric therapy as a child. Winnie wanted to enroll James in a summer camp for youths with emotional problems, but Bradley would not allow it. Bradley, Winnie said, "was a very strict father and thought that all Steven needed was discipline."

James attended Campo Bello Elementary School between 1964 and 1972, receiving mostly C's and D's in his classes and "unsatisfactory" marks in measures of "citizenship" such as "behavior," "dependability," "courtesy," "care of property," and "work habits." In standardized tests administered annually between first and sixth grades, James consistently scored below the class median. James's IQ was measured three times, yielding scores of 98, 90, and 86. Charles Beaulieu, an elementary school classmate, described James as "a little different. . . . He was intellectually slower, a little behind everyone else."

James was a poor student and earned mostly D's at Paradise Valley High School by his sophomore year. Bradley and Winnie hired a tutor, but James kept falling behind. Winnie recalled that he seemed to be losing motivation. James also began using marijuana, prompting his parents to withdraw him from Paradise Valley and enroll him in military school. James spent only a few months there, receiving mostly C's and D's, and was dismissed for accumulating excessive demerits. After his expulsion from military school, James enrolled at Apollo High in Glendale, Arizona. At Apollo, James resumed using drugs, received mostly F's, and dropped out after 11th grade.

James married Marna Hulgren in January 1980. The marriage lasted less than a year. Hulgren declared that she "loved Steven dearly, but it became more and more difficult to live with him. He constantly needed attention, like a little boy, and I felt like a baby sitter." James "was seriously mentally ill and desperately needed help." James experienced "dramatic, instant and unpredictable mood swings, on average three times a week. . . . [T]he smallest of things would set [James] off into rages, often for fifteen or twenty minutes at a time." Hulgren recalled one incident in which Winnie James accidentally knocked over a vase. Although James caught the vase, preventing it from breaking, he "yelled at his mother in uncontrolled anger." On another occasion, James threw a

table across a room in anger. Hulgren also declared that James "had hallucinations. I remember him telling me that he saw little green men in the corner of the room. . . . He also fantasized that he was a descendant of the outlaw, Jesse James." Hulgren described James's sexual appetite as "seemingly insatiable" and "very abnormal." Although James was "terribly disturbed and needed help in the worst way," he refused to seek psychiatric care.

In 1981, Roxann Hallquist, James's full sister, located and visited James, whom she had not seen since his adoption about 20 years earlier. James returned to California with Hallquist to reconnect with the rest of his family of origin. The trip proved traumatic. When he first saw his mother Lora, James asked, "Why did you sell me and keep my brother and sisters?" James told Lora that he believed she had "sold" him to Bradley and Winnie James; apparently, Bradley and Winnie referred to James as "bought and paid for." James also learned that his biological father, Lester Pannell, had been incarcerated. After the visit James told Jim Stepp, "I'm just like my old man. No good." Marna Hulgren declared that James "had been told that his biological father was in prison, and he had a strong belief — a fixation — that he would also end up in prison."

James spent much of his time in California with Jerry Isgrigg Jr., then 18, who regarded James as a "big brother" and told James about sexual abuse inflicted by Norman Osteen Sr. Jerry Jr. declared that he and James "drank a lot of beer and smoked pot all the time. Steven also used cocaine whenever he could. We were high most of the time." James and Jerry Jr. hitchhiked to Arizona so that James could retrieve his pickup truck, which the two drove back to California before selling it for a motorcycle and cocaine. Donna Herzog declared that "Steven and Jerry were both using a lot of drugs, especially LSD, and Steven was a mess."

James's depression worsened after he returned from California. Jim Stepp said that James "could not understand why

his mom had given him away when she had other kids, and then she had even more babies after giving him away. This devastated Steve. He felt worthless." According to Don Thorp, James said that his "home environment before his adoption had been very bad. . . . [H]is biological father had been in prison and his biological mother had been involved in prostitution and drugs." James's drug use intensified after he returned from California. Stepp saw James and two men he believed to be Libberton and Norton "obviously high" a few weeks before Maya's murder. "Their eyes were glassy and their speech was slurred." James, Norton, and Ross Waller drank and used drugs together during the months preceding the murder. Waller said that "[w]hen Steve was awake, he was drinking beer and smoking marijuana much of the time. I also saw him taking LSD, cocaine, [and] mushrooms." When James was high, Waller said, "[t]he drugs and alcohol affected [James's] personality and the way he acted. . . . [H]e often got mad [at] other people when he got drunk or high. He had a difficult time letting go of things that irritated him, and he would stay agitated well into the next day."

Waller stated that on November 16, he, James, and Norton, among others, "were drinking all afternoon" in James's trailer. When he left with Norton to "dine and dash," on the evening of the murder, James was "pretty plastered." Daniel Severance, James's roommate for the six weeks preceding the murder, stated that on the day before the murder James was "very emotionally upset . . . because his girlfriend had recently left him," and "was extremely violent as a result of drinking due to the situation involving his girlfriend." In Severance's opinion, James "was in a very bizarre emotional state as a result of his girlfriend's departure, the manner in which she left, and because he was also quite intoxicated." In an affidavit given in 1993 in conjunction with Libberton's post-conviction proceedings, Daniel McIntosh confirmed that James "was upset because his girlfriend had moved out to live with two black men," and stated that James had borrowed a gun from a neighbor. Severance stated that James "also

became very upset involving any situation with Martin Norton, who [James] looked at as a son. He attempted to take care of [Norton] and would become extremely upset if something happened with this relationship."

**[14]** The meager mitigation evidence presented at sentencing bore no resemblance to the detailed narrative of James's life and mental health constructed by habeas counsel. The failure to present evidence of childhood conditions like those James experienced while living with Lora Pannell has consistently been found prejudicial. *See, e.g.*, *Sears v. Upton*, 130 S. Ct. 3259, 3262 (2010) (parents' physically abusive relationship and divorce when defendant was young; verbal abuse); *Porter*, 130 S. Ct. at 449 (witnessing domestic violence as child; father shooting at defendant but missing); *Rompilla*, 545 U.S. at 391-92 (alcoholic parents who fought violently; no expressions of parental love or affection; verbal abuse); *Wiggins*, 539 U.S. at 517 (severe sexual and physical abuse; placement in foster care); *Terry Williams*, 529 U.S. at 395 (parents imprisoned for neglect; defendant committed to state custody and placed in foster care). James was similarly prejudiced in this case.

The district court erroneously discounted the significance of the evidence of James's early childhood on the ground that James "has no recollection of the first few years of his life." It is well established that early childhood trauma, even if it is not consciously remembered, may have

> catastrophic and permanent effects on those who . . . survive it. It has a severe impact on the child's mental development and maturation. Sustained feelings of terror, panic, confusion, and abandonment as a child have long term consequences for adult behavior. Psychosis, dissociative states, depression, disturbed thinking and alcohol and drug dependency are directly linked to child victimization.

*Hamilton*, 583 F.3d at 1132-33 (internal quotation marks and citation omitted) (describing effects of a childhood home in which defendant's father was an alcoholic, beat defendant's mother, and both parents sexually abused defendant's sister).

The district court also discounted evidence of James's early trauma in the Pannell home based on James's "good fortune in being adopted at age four" into what the PSR described as a "good, stable middle class home in which he always felt loved and protected." The court's reasoning underscores the manner in which Pillinger's deficient performance prejudiced James. Pillinger left the sentencing court with the erroneous impression that James experienced no residual effects of the abuse and neglect that he suffered in the Pannell home, and that Winnie and Bradley James were unambiguously loving and effective parents. Winnie testified at the penalty phase that after his adoption James's life became normal and stable. Likewise, the PSR concluded that the "disruptive and unstable" circumstances of the Pannell home were replaced by the "good, stable middle class home" provided by the Jameses.

In fact, habeas counsel demonstrated that, despite his adoption, James experienced severe emotional problems. James feared the dark, wet his bed, and made few friends. He was a poor student who dropped out of high school. He "worshiped" his father Bradley, but received little paternal love or approval. Instead, Bradley whipped James to discipline him. Bradley and Winnie, who lacked the parenting experience necessary to raise an emotionally troubled child like James, discontinued his prescription medications and did not seek mental health counseling for him. The inaccurate assessment before the trial court prevented the court from appreciating the severity of James's pre-adoption circumstances and their lifelong impact on him. *See Sears*, 130 S. Ct. at 3261 (prejudice where defendant's childhood was inaccurately portrayed as "stable, loving, and essentially without incident"); *Rompilla*, 545 U.S. at 391 (evidence of childhood in "slum environment," discontinuation of education at age 16, and teenage

alcohol consumption "would have destroyed the benign conception of [the defendant's] upbringing . . . counsel had formed from talking with [the defendant] himself and some of his family members"); *Hamilton*, 583 F.3d at 1120 (where counsel failed to elicit evidence of childhood hardship from mother during penalty phase, mother's testimony "left the false impression that [the defendant's] childhood, while unhappy, was not unusual").

Pillinger also failed to present evidence of James's mental illness as a mitigating circumstance, a deficiency that has repeatedly been found prejudicial. *See, e.g.*, *Porter*, 130 S. Ct. at 454 (brain abnormality and cognitive defects); *Rompilla*, 545 U.S. at 392 ("organic brain damage" and "extreme mental disturbance significantly impairing several of [the defendant's] cognitive functions"); *Daniels v. Woodford*, 428 F.3d 1181, 1209 (9th Cir. 2005) ("family history of mental illness"); *Summerlin*, 427 F.3d at 641 ("lack of impulse and emotional control and organic brain dysfunction"). Similarly, we have found prejudicially deficient the failure to employ a mental health expert to explain the effect of traumatic experiences on a defendant's conduct. *See, e.g.*, *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).

The district court concluded that James was not prejudiced because the sentencing judge, in determining competency to stand trial, was able to consider a great deal of evidence related to his mental health, including his "918" classification, his suicide attempts in pretrial detention, and the evaluations provided by Drs. Tuchler, Berger, and Potts, including the latter's diagnosis of cyclothymia. A defendant who is mentally competent for trial may nonetheless suffer a mental illness that is severe enough to mitigate his culpability. *See Summerlin*, 427 F.3d at 631; *Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995). More fundamentally, James was prejudiced because Pillinger failed to characterize James's mental illness

as a mitigating circumstance or to elicit Potts's opinion as to whether James's "capacity . . . to conform his conduct to the requirements of law was significantly impaired," under ARIZ. REV. STAT. § 13-703(G)(1). In his 1995 affidavit, Potts stated that he was not

> asked to evaluate the effect of [James's] mental condition, family and social history, and drug usage on his mental state or his ability to control his conduct the night that [Maya] was killed. . . . [N]o evidence was brought to the court's attention to properly evaluate the important effect of social, psychiatric, and psychological factors on [James's] conduct.

Pillinger argued the mitigating circumstance under § 13-703(G)(1) only with respect to James's intoxication, not his mental illness. Without any indication that Potts's diagnosis was mitigating in nature because it affected James's volitional capacity, the sentencing court would not have afforded James's cyclothymia, suicide attempts, and depression appropriate mitigating weight under state law. *See, e.g.*, *State v. McMurtrey*, 726 P.2d 202, 206-07 (Ariz. 1986) (section 13-703(G)(1) mitigating circumstance not established where defendant, "while eliciting some evidence of emotional or mental impairment, . . . was unable to provide a precise showing of its substantial significance in causing defendant's conduct"); *State v. Murray*, 906 P.2d 542, 575 (Ariz. 1995) ("Character or personality disorders alone are generally not sufficient to find that defendant was significantly impaired.").

Pillinger's failure to investigate James's long-term drug abuse further harmed James's mitigation case. Pillinger presented evidence of intoxication at the penalty phase, but focused exclusively on James's drug use at the time of the crime. Had Pillinger developed evidence of James's long-term drug use, he could have presented a coherent account of James's emotional and psychological deterioration during 1981, fueled by drug abuse, that culminated in Maya's mur-

der. *See, e.g.*, *Mayfield v. Woodford*, 270 F.3d 915, 931 (9th Cir. 2001) (en banc). In *Mayfield*, we found counsel's penalty phase performance prejudicially deficient based in part on the postconviction testimony of a psychiatrist who described the defendant's suffering " 'a growing onslaught of catastrophes, losses, and increased emotional turmoil that were boiling up,' exacerbated by 'the continued drug use that makes it more difficult for [the defendant] to figure out what is the best thing to do and how to control his emotions.' " *Id.* at 931. As here, the defendant's psychological setbacks in *Mayfield* included a breakup with a girlfriend and a suicide attempt. *Id.*

**[15]** In the year before the murder, James's wife Marna Hulgren divorced him and another girlfriend left him. James took a deeply traumatic trip to California and met his dysfunctional biological family. James confronted his mother Lora Pannell and asked why she had given him up for adoption and not his siblings. Lora did not respond. James learned for the first time that his father Lester Pannell had been incarcerated and began to believe that he would share his father's fate. James met his half-brother, Jerry Isgrigg Jr., who told James about the sexual abuse he suffered at the hands of Norman Osteen Sr. James grew close to Isgrigg, who told James that he "wished [James] had been there earlier, to protect me from [Norman Sr.]." James's depression and drug use worsened after his return from California. Jim Stepp — whom Probation Officer Santos interviewed in compiling the PSR — attributed this deterioration to James's feelings of worthlessness at having relived his mother's rejection. On the night of the murder, Martin Norton, whom James treated "like a son," reported that he too had been sexually assaulted. This confluence of loss, dysfunction, shame, depression, self-medication, and anger would have provided context and explanation for Maya's murder. If Pillinger had competently discharged his investigative duties, he could have presented a powerful narrative that would have mitigated the "heinous, cruel, and depraved" aggravating circumstance — the sole aggravating circumstance that now supports James's death sentence. There

is a "reasonable probability" that a sentencing judge confronted with all of the information now available would have drawn a different conclusion in balancing the mitigating factors against the heinousness and depravity of the killing. *See, e.g.*, *Stanley*, 598 F.3d at 625.

The state argues that much of this material was before the sentencing judge in the PSR, and that James was not prejudiced because the material now proffered by habeas counsel would have been cumulative. We have several times rejected variations of this argument. *See, e.g.*, *Correll*, 539 F.3d at 949-50, 953 n.8; *Lambright v. Schriro*, 490 F.3d 1103, 1125-26 (9th Cir. 2007); *see also, e.g.*, *Stanley*, 598 F.3d at 624. The PSR presented a relatively spare recitation of facts and did so in the context of a recommendation that James be sentenced to death. The PSR also recited the opinions of Maya's family members, Detective Davis, and the lead prosecutor, Myrna Parker, that James should be sentenced to death. As in *Correll*, the PSR was "one-sided." 539 F.3d at 949. The PSR opined that Maya's murder was "senseless, unnecessary, and executed in a particularly depraved and cruel manner. The mental and physical suffering which the victim presumably experienced before his death should be considered . . . . Additionally, the defendant has failed to admit his wrongdoing and has attempted to minimize his involvement in the offense." As in *Correll*, "[t]hese statements are hardly the words of mitigation, and no competent capital defense counsel would have relied upon such a report as providing mitigation evidence." *Id.*; *see also Stanley*, 598 F.3d at 624 ("Even where the sentencer is aware of facts underlying the defendant's mitigation case, trial counsel may not necessarily rest on these facts."); *Lambright*, 490 F.3d at 1125 ("The sentencing judge cannot be expected to comb the record looking for mitigating factors, particularly where the minimal evidence that exists is buried in reports that are on the whole strongly unfavorable to the defendant.").

Lester Pannell was not merely a "drug addict [who] was sentenced to prison when [James] was very young," as the

PSR put it. He was a lifelong heroin addict and alcoholic, a "vicious and hard-hearted man" who shot up in front of his children, beat James's mother for keeping a messy house, and "never expressed even the slightest interest" in the well-being of his children before abandoning them. Lora Pannell did not merely "have too many children to support," as the PSR put it. She was a teenage mother with five children by three fathers who alternately neglected and verbally abused her children. Lora raised her children in poverty and allowed unsuitable men into the home — including Jerry Isgrigg Sr., an alcoholic with a felony assault conviction, and Samuel Osteen and Norman Osteen Sr., serial child sexual abusers. At one point, Lora came close enough to killing James that she placed a pillow over his face. It is not clear that Lora voluntarily "gave custody of [James] and his sister [Donna] to the state," as the PSR put it. Tacla Machesney and Roxann Hallquist both indicated that all of Lora's children were forcibly removed from her home and placed in foster care. Machesney stated that when Donna, then less than a year old, was adopted, she had a broken collarbone and nose and was wearing ill-fitting, soiled clothes. James's trip to California did not simply have a "devastating impact" on him, as the PSR put it, but set in motion a steep deterioration in his emotional health and his drug abuse.

Finally, the PSR makes clear that most of its social history favorable to James came from James himself. The trial court found James to lack credibility and therefore discounted his evidence. The court referred to James's account of his LSD use on the night of the murder as "self-serving," and James's testimony in support of his duress defense as "blatant perjury." Evidence from James's family members and friends would have given his self-reported social history much needed corroboration.

### 4. Reweighing

To ascertain whether James has shown a reasonable probability of a different outcome, "we consider 'the totality of the

available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweig[h] it against the evidence in aggravation.' " *Porter*, 130 S. Ct. at 453-54 (quoting *Terry Williams*, 529 U.S. at 397-98) (alteration in original). In doing so, we put to one side the pecuniary gain aggravating circumstance found by the trial court but stricken by the Arizona Supreme Court. *James*, 685 P.3d at 1298. That is, we assess what reasonably could have happened had the trial court "appropriately reduced the ballast on the aggravating side of the scale." *Porter*, 130 S. Ct. at 454; *see also Boyde v. Brown*, 404 F.3d 1159, 1179-80 (9th Cir. 2005).

The killing of Maya was appalling. It was a hate crime. Maya was targeted because of his sexual orientation. He was beaten, taunted, robbed, and forced to contemplate his impending death during the last hours of his life. But the heinousness of the crime does not in itself compel the conclusion that James was not prejudiced. *See Stanley*, 598 F.3d at 616; *Stankewitz*, 365 F.3d at 723; *Douglas*, 316 F.3d at 1091. The state offered Glenn Johnson, James's initial trial counsel, a life sentence with the possibility of parole after 25 years in exchange for a guilty plea to first-degree murder. Against Johnson's advice, James refused. The "mitigatory effect" of the state's willingness to accept a non-capital disposition "is clear: the prosecution thought this was not a clear-cut death penalty case." *Scott*, 567 F.3d at 584; *Summerlin*, 427 F.3d at 631.

The mitigation evidence that was available but not presented at the penalty phase trial was significant. Lester and Lora Pannell were utterly unfit parents who exposed James to violence, drug abuse, poverty, and sexually predatory adults. James's siblings suffered physical and sexual abuse. After his adoption, James showed the residual effects of life in the Pannell home: he was fearful, friendless, and needy. Instead of the paternal affection James craved, Bradley James administered disciplinary beatings. James was a dismal student, a

high school dropout, and a habitual drug user. In the year before the murder, his marriage ended and he learned of the extensive dysfunction in his biological family. The single most significant category of mitigating evidence advanced — evidence of dysfunction in the Pannell home — supplies a "graphic description" of James's childhood, "filled with abuse and privation, . . . [which] might well have influenced the jury's appraisal of his moral culpability." *Terry Williams*, 529 U.S. at 398 (citing *Boyde v. California*, 494 U.S. 370, 387 (1990)).

**[16]** We conclude that there is a reasonable probability that a sentencing court confronted with the powerful mitigating evidence developed by James's habeas counsel would not have returned a death sentence. James has therefore shown that Pillinger provided constitutionally ineffective assistance.

We remand and instruct the district court to grant the writ, rather than hold an evidentiary hearing. Counsel for the state conceded at oral argument that the state has never contested any of the evidence supporting James's ineffective assistance of counsel claim. Counsel also left unchallenged an assertion by this court that there was "no real dispute about the facts." In eleven years of federal litigation, the state has yet to identify a single piece of evidence that it would dispute at a hearing. Nor has the state suggested that it wishes to present any evidence of its own. We need not require that the district court hold an evidentiary hearing at which the state would not contest or present any evidence. The only point of an evidentiary hearing, in the state's view, would be to cross-examine James's witnesses; however, a general desire to cross-examine an affiant does not suffice to raise a genuine dispute.

Rather than disputing the veracity of the evidence supporting James's *Strickland* claim — as the state did with his *Brady/Giglio* and *Napue* claims — the state has challenged only the legal sufficiency of the evidence. Even in its petition for rehearing before this court, the state simply contested

James's evidence as "cumulative." As a result, no evidentiary hearing is required because "the claim presents a purely legal question and there are no disputed facts." *Beardslee v. Woodford*, 358 F.3d 560, 585 (9th Cir. 2004). Although courts often invoke this rationale to deny a petition without a hearing, this is a case in which we may grant the writ without a hearing. *See Browder v. Director, Dep't of Corr.*, 434 U.S. 257, 266 n.10 (1978) (recognizing agreement among the circuits that federal courts may "discharge a habeas corpus petitioner from state custody without conducting an evidentiary hearing, when the facts are undisputed and establish a denial of petitioner's constitutional rights"). The Supreme Court and this court have previously granted habeas relief in circumstances, such as this, where no evidentiary hearing was held below. *See, e.g.*, *Hitchcock v. Dugger*, 481 U.S. 393, 395, 399 (1987); *Robinson*, 595 F.3d at 1099, 1113 (granting habeas relief on penalty phase ineffective assistance of counsel claim); *Libberton*, 583 F.3d at 1165, 1174 (same).

Despite this controlling precedent, the state argues — without supporting authority — that courts cannot grant habeas relief based on affidavits without subjecting the evidence to cross-examination at a hearing. At oral argument the "only thing" counsel for the state cited as legal authority on this point was 28 U.S.C. § 2254(e)(2); however, that provision describes circumstances that prohibit, rather than require, an evidentiary hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 473 n.1 (2007). Moreover, the Advisory Committee Note for Rule 8 of the Rules Governing § 2254 Cases expressly states that a court "may grant the [habeas] relief sought without a hearing." *See also* 1 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 20.1[a] (6th ed. 2011) ("federal courts have the power to grant habeas corpus relief without holding an evidentiary hearing, even on fact-based claims" (footnote omitted)). Our sister circuits agree that federal courts may grant habeas relief without a hearing. *See Noble v. Kelly*, 246 F.3d 93, 100-01 (2d Cir. 2001) (per curiam); *Tague v. Puckett*, 874 F.2d 1013, 1015

(5th Cir. 1989). Rule 7(c) of the Rules Governing § 2254 Cases requires that a court give the opposing party an opportunity to admit or deny the correctness of any additional materials submitted to expand the record of a habeas petition. However, the state has had ample time to contest the evidence submitted with James's habeas petition and Rule 59(e) motion, and has failed to avail itself of that opportunity.

Finally, this case is unlike others where we remanded for a hearing. For example, unlike in *Earp v. Ornoski*, 431 F.3d 1158, 1169-70 (9th Cir. 2005), there is no material dispute about the affiants' credibility. Likewise, this is not a case in which we must determine that the petitioner's allegations are colorable. *See, e.g.*, *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005). James has introduced a plethora of evidence to support the allegations of his petition.

We conclude that the district court was within its discretion to deny an evidentiary hearing absent controverted facts, *see, e.g.*, *Beardslee*, 358 F.3d at 585, but abused its discretion by rejecting James's Rule 59 evidence as legally immaterial, *see, e.g.*, *Strauss v. Comm'r*, 635 F.3d 1135, 1137 (9th Cir. 2011) ("An error of law is an abuse of discretion.").

## Conclusion

**[17]** We affirm the district court with respect to James's guilt phase claims based on *Brady*, *Giglio*, and *Napue*. We reverse and remand with instructions to grant the writ with respect to the death sentence. We instruct the district court to grant the state a reasonable amount of time in which to resentence James. If the state chooses not to resentence, James's sentence will automatically be converted to life in prison in accordance with Arizona law. *See Libberton*, 583 F.3d at 1174.

AFFIRMED in part; REVERSED and REMANDED in part.