BERZON, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that Miles has not shown that he. is entitled to relief under the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, on the basis of his counsel’s alleged deficiencies in *1145 presenting addiction as a mitigating factor and in preparing Dr. Levy to testify. I cannot agree, however, with the majority’s conclusion that Miles is not entitled to relief based on his counsel’s deficient investigation of his troubled background. In rejecting this claim, the state court applied Strickland in a way inconsistent with the holdings of several Supreme Court cases. Its decision was therefore “contrary to” clearly established Federal law, and we should conduct de novo review. On de novo review, I would conclude that Miles’s counsel was constitutionally deficient and that Miles was prejudiced by this deficiency. On this point, therefore, I dissent.
A. AEDPA
The Arizona Superior Court rejected Miles’s failure-to-investigate claim on the ground that “a Defendant must bear some responsibility to assist his or her attorney in preparing a defense [and that] an attorney should be able to rely on his/her client to bring pertinent facts to his/her attention.” [1] Because this ground is “contrary to ... clearly established Federal law,” this claim should be reviewed de novo. 28 U.S.C. § 2254(d)(1); Frantz v. Hazey, 533 F.3d 724, 734 (9th Cir.2008) (en banc).
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the seminal ineffective assistance of counsel case, explained that
[t]he reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions.... In particular, what investigation decisions are reasonable depends critically on such information____ [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.
Id. at 691, 104 S.Ct. 2052. What Strickland did not say is that a failure to investigate claim can be dismissed out of hand whenever the defendant had information about his past and failed to provide it to his lawyer. Instead, Strickland stated only that competent counsel can rely to some degree, with regard to the scope of an investigation, on what the defendant does tell the lawyer, not on what he does not.
After Strickland, the Supreme Court specifically held, more than once, that an attorney’s duty to investigate a defendant’s background in preparation for sentencing is not circumscribed by the degree to which the defendant offers up mitigating information about his past. In Porter v. McCollum, for example, the court emphasized that whether a defendant is “fatalistic or uncooperative ... does not obviate the need for defense counsel to conduct some sort of mitigation investigation.” 558 U.S. 30, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009). And in Rompilla v. Beard, the Court held counsel’s mitigation investigation deficient despite the defendant’s “minimal” contributions and refusal to discuss his background. 545 U.S. 374, 381-82, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). In contrast, the Court has explained, a defendant’s active obstruction of counsel’s efforts to perform a mitigation investigation can prevent him from showing prejudice under Strickland. See Schriro v. Landrigan, 550 U.S. 465, 466, 127 S.Ct. 1933, 167 *1146 L.Ed.2d 836 (2007). Except in that circumstance, the Court has recognized, a competent attorney would independently seek mitigation evidence rather than rely on the defendant’s representations about his past.
Moreover, the ABA Guidelines in effect at the time of Miles’s sentencing specified that “[t]he investigation for the preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.” See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989). “Prevailing norms of practice as reflected in American Bar Association standards ... are guides to determining what is reasonable .... ” Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
The state court did recite the general, two-prong Strickland standard at the beginning of its opinion (under the heading “standard of review”). But then, as evidenced by the passages quoted above, the court did not apply that standard in accord with clearly established Supreme Court precedents when evaluating the substance of Miles’s claim as it related to Sattler’s investigation of his background. Instead, it held that there cannot be ineffective assistance of counsel — indeed, the question cannot even be litigated — if the defendant did not affirmatively inform his counsel at trial of the information he now contends should have been developed and used.
A similar sequence occurred in Lafler v. Cooper, in which the state court articulated the correct standard established by Strickland but then “fail[ed] to apply Strickland to assess the ineffective-assistance-of-counsel claim respondent raised,” meaning that “the state court’s adjudication was contrary to clearly established federal law.” — U.S.-, 132 S.Ct. 1376, 1390, 182 L.Ed.2d 398 (2012); see also Premo v. Moore, — U.S.-, 131 S.Ct. 733, 743, 178 L.Ed.2d 649 (2011) (citing Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), for the proposition that “[a] federal habeas court may issue the writ under the ‘contrary to’ clause if the state court applies a rale different from the governing law set forth in our cases.... ”). In sum, the Supreme Court has never imposed an affirmative disclosure obligation on defendants and has recognized that attorneys have an obligation to investigate mitigation evidence regardless of whether the defendant has provided mitigating information to counsel.
The majority argues that it is wrong to “attribut[e] strict rules to [the Supreme] Court’s recent case law.” Maj. Op. at 1141 (quoting Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 1406-07, 179 L.Ed.2d 557 (2011)). I agree entirely. My argument is not that we should apply a bright-line rule when evaluating the performance of counsel; my argument is that the Arizona Superior Court erred by doing just that, treating the evaluation of Miles’s Strickland claim as if it turned entirely on the fact that he could have told his lawyer about his childhood but did not do so. The Arizona Superior Court’s flat statement that “an attorney should be able to rely on his/her client to bring pertinent facts to his/her attention” is thus squarely inconsistent with clearly established Supreme Court law. Miles’s claim should therefore be reviewed de novo.
B. Ineffective Assistance of Counsel
In evaluating the merits of Miles’s ineffective assistance of counsel claim, I begin by comparing with some clarity and depth the facts about Miles’s background known to Sattler before the sentencing hearing and the facts that came to light during his state habeas proceedings.
The record paints a fairly clear picture of what Sattler knew about Miles’s back *1147 ground before his sentencing. Viewed next to what came out later, it wasn’t much. In a detailed letter to Dr. Levy, Sattler wrote that Miles was adopted when he was two months old, and that “all the information I have received about [Miles’s adoptive mother] indicates that she was very devoted to Kevin and worked very hard to give him material things as well as a great deal of love and affection.” Sattler notes that Miles moved to Winslow with his adoptive mother when he was young and then discusses his high school years, indicating that he was “well liked,” “active in student activities,” and that “there was never any incidence of violence in his school years that anyone is aware of.” The information about Miles’s pre-high school life takes up one paragraph in the letter.
After interviewing Miles, Dr. Levy wrote a letter to Sattler in which he indicated that Miles’s adoptive mother “was a single parent who held a variety of jobs from professional to laborer,” and that her habit of frequently changing jobs may have been due to alcoholism. Still, Dr. Levy says, Miles’s “early years were described as good ones.and ‘pretty normal.’ ” The Presentence Report does not shed any additional light on Miles’s childhood, repeating the assertion that his mother was an alcoholic and that “she cooked, waited tables, and worked at a convenience store, before becoming a nursing home administrator.” The PSR also notes that Miles had trouble fitting in because he was black in a small Arizona town. This, then, was what Sattler knew of Miles’s childhood: that he was adopted at a young age and that his adoptive mother may have been an alcoholic, but that she worked hard and provided him with an upbringing that was “pretty normal.”
The investigations conducted after Miles was sentenced, which resulted in a 83-page report prepared for his state habeas proceedings, paint a very different picture, one rife with drugs, prostitution, and violence.' Miles’s adoptive mother, Lois, was married to a pimp named Alfred Miles, who ran a bar, restaurant, and hotel in Tulsa called El Rancho. Miles’s birth mother was one of Alfred’s prostitutes, and may have been a heroin addict. Both Lois and Miles’s birth mother lived in rooms at the El Rancho. Lois was terrified of Alfred and often heard him beating Miles’s birth mother mercilessly, possibly while she was pregnant with Miles. Lois informally adopted Miles, and when he was two she took him and fled to Arizona, settling in Winslow.
In Winslow, Lois met Jasper Renfro, who operated a bar called the Prairie Moon, which had rooms in the back that were rented to prostitutes for $2.00. Lois began working there as a prostitute and bartender, and moved into a two-bedroom house next door. Lois and Miles slept in one room, and prostitutes turned tricks in the other. When Lois had a customer, she would ask one of the other prostitutes to watch Miles while she was occupied. Lois drank heavily, and although her fellow prostitutes insisted that none of them used drugs, a Winslow police officer who was interviewed once found heroin at the house and recalled that the women there were “all drug addicts.”
Kevin Hernandez, who was Miles’s age and grew up on the same block, remembered looking over the fence that faced the alley behind the Prairie Moon and seeing prostitutes having sex. He also remembered hearing gunfire on weekends. At one point during Lois and Miles’s time at the house, “a girl named Charmaine shot an Indian at the house. The police followed the blood trail to the front door and tore the house apart looking for the gun.”
When Miles was around 7, he and Lois moved to another house a few blocks away *1148 from the Prairie Moon. A prostitute named Connie, who lived with Lois and Miles next to the Prairie Moon and was also a heroin addict, was shot and killed about a year after Lois and Miles moved to their nearby house. Lois was trying to turn her life around at this point, and took a job as a cook, although she may have continued working as a prostitute (her boss was a “known pimp,” according to the investigator’s report, and she occasionally left Miles alone at the restaurant).1979, when Miles was around 11, Lois got a job as a dietary aide at a convalescent center. She worked there for seven years, rising to become the administrator before being fired for drinking on the job the same year Miles graduated from high school. Lois and Miles slept in the same bed until he was 14.
1. Deficient Performance
The majority views Sattler’s decision not to further investigate Miles’s background as reasonable in light of her strategic decision to present Miles as a fundamentally normal person who had a viable chance of being rehabilitated if spared execution. While the Supreme Court has instructed us to treat with deference the strategic decisions of counsel, see, e.g., Pinholster, 131 S.Ct. at 1407-08, it is hard to see how Sattler could have made a reasonable strategic choice not to present the harrowing details of Miles’s childhood when she knew virtually nothing about what that childhood was like. Treating this strategic decision as determinative introduces an element of circularity into the analysis: Sattler’s choice not to learn about Miles’s childhood was reasonable because it was part of her strategy, which she adopted because she knew nothing about Miles’s childhood. As the Supreme Court has observed, “counsel’s failure to uncover and present voluminous mitigating evidence at sentencing [cannot] be justified as a tactical decision ... [where] counsel had not ‘fulfilled their obligation to conduct a thorough investigation of the defendant’s background.’ ” Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Williams, 529 U.S. at 396, 120 S.Ct. 1495). In other words, a strategic choice is only reasonable to the extent that “the investigation supporting [that choice] ... was itself reasonable.” Wiggins, 539 U.S. at 523, 123 S.Ct. 2527 (emphasis in original). The relevant question, then, is whether Sattler’s investigation “fell below an objective standard of reasonableness.... under prevailing professional norms.” Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
Sattler’s efforts to investigate Miles’s background fell below prevailing professional norms. Sattler did work with an investigator in preparation for trial, but that investigator was not trained in investigating homicide cases or conducting mitigation investigations. Sattler’s letters to the investigator show that Sattler was focused on finding people in Tucson who might know something about the crime, rather than on finding information about Miles’s background.
Sattler did ask the investigator to interview four people from Winslow. Of these, the investigator spoke to three high school friends who knew nothing of Miles’s earlier childhood. The investigator submitted the fruits of these interviews to Sattler in two “interview reports,” each a single page, and no formal background report was prepared. The investigator never traveled to Winslow. When she was deposed in connection with Miles’s federal habeas petition,[2] the investigator had no recollection of Miles’s name or of her work on the case, *1149 and, looking over the record, she expressed surprise at how little information her investigation produced. Although Sattler knew that Miles had been adopted at an early age and that his mother was an alcoholic who had trouble holding a job, she and her investigator did nothing to find out about his pre-high school life.
In short, this was not a case in which counsel “ ‘did spend considerable time and effort investigating avenues for mitigation.’ ” Pinholster, 131 S.Ct. at 1404 (quoting Pinholster v. Ayers, 590 F.3d 651, 701-02 (9th Cir.2009) (Kozinski, J., dissenting)). The ABA guidelines in effect at the time made clear that “[t]he investigation for preparation of the sentencing phase ... should comprise efforts to discover all reasonably available mitigating evidence.” ABA Guidelines 11.4.1(C). Thus, under the prevailing professional norms at the time of Miles’s sentencing, “counsel had an ‘obligation to conduct a thorough investigation of the defendant’s background.’ ” Porter, 130 S.Ct. at 452 (quoting Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).
Like the investigations in Porter and Wiggins, Sattler’s work here fell well short of the thoroughness required in capital cases. As in Porter, Sattler “ignored pertinent avenues for investigation of which [she] should have been aware,” 130 S.Ct. at 453, i.e., Miles’s life up until he entered high school. As in Wiggins, Sattler “abandoned [her] investigation of [Miles’s] background after having acquired only rudimentary knowledge of his history from a narrow set of sources.” 539 U.S. at 524, 123 S.Ct. 2527. In Wiggins, those sources included psychological tests, records from the Department of Social Services documenting petitioner’s time in the foster system, and a one page account of petitioner’s personal history contained in the presentence report. The materials available to Sattler were considerably more scant. She did not ask Dr. Levy to conduct any psychological tests, and she obtained no comparable government records concerning Miles’s childhood.
Even if Miles’s reticence about disclosing the details of his childhood with Sattler is taken as a factor in the deficient performance calculus (rather than the sole determinant, as the state court held), that reticence does not countervail Sattler’s failure to investigate. After all, Miles may not have even remembered some of the circumstances of his early life, yet “early childhood trauma, even if it is not consciously remembered, may have ‘catastrophic and permanent effects on those who ... survive it.’ ” James v. Ryan, 679 F.3d 780, 815 (9th Cir.2012) (quoting Hamilton v. Ayers, 583 F.3d 1100, 1132 (9th Cir.2009)). Miles “may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct some sort of mitigation investigation.” Porter, 130 S.Ct. at 453 (emphasis in original) (citing Rompilla, 545 U.S. at 381-82, 125 S.Ct. 2456). Sattler’s investigation into Miles’s background, particularly her failure to learn any of the disturbing facts about his early childhood, was not reasonably in line with prevailing professional norms.
2. Prejudice
The majority characterizes the additional information about Miles’s childhood that came to light after his sentencing as “largely cumulative” of what was before the sentencing judge, and concludes that even if Sattler’s representation was not constitutionally deficient, there was no “reasonable probability that, but for [Sattler’s] unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. I cannot agree.
*1150 It is worth remembering how little of Miles’s pre-high school life was in the record when he was sentenced. The PSR contains two paragraphs of social history, and has this to say about Miles’s childhood:
The defendant reported his adoptive mother was an alcoholic. She cooked, waited tables, and worked at a convenience store, before becoming a nursing home administrator. He reported he was not accepted by everyone because he was black, and his mother was white. He also indicate[d] he experienced ‘culture shock’ when he and his mother moved into a more affluent neighborhood and attended a better school.
Dr. Levy’s report, which was also before the sentencing judge, indicates that Miles’s mother was an alcoholic and that racism was an issue for him, but notes that “his early years were described as good ones and ‘pretty normal.’ ” These brief summaries are, to put it mildly, a far cry from the information that came to light later, which showed that both Miles’s birth and adoptive mothers were prostitutes, that Miles’s birth mother was a heroin addict and may have been beaten by her pimp while she was pregnant with him, and that Miles spent his early years living in a two bedroom brothel, surrounded by prostitution, heroin use, alcohol abuse, shootings, and even murder. To call this childhood anywhere near “pretty normal” is strange indeed. The difference between these two narratives is one of kind, not degree.
I also cannot accept the majority’s view that this mitigation evidence is far milder that in James v. Ryan, 679 F.3d 780. As in James, Miles survived a childhood rife with violence, drug use, and crime. While there is no indication that Miles was, like James, physically abused, James was not raised by prostitutes, nor was his childhood home the scene of murders and shootings. For, contrary to the majority’s account, James did not “grow up” in the abusive circumstances described. Instead, at age four, James was adopted by parents who were strict but loving, and his life circumstances from thence forward took a dramatic turn for the better. Id. at 812. Miles saw his situation improve somewhat as he aged, but he and his mother didn’t move out of the house next to the Prairie Moon until he was seven, and his mother may have continued to work as a prostitute until he was 11. They slept in the same bed until he was 14. My point here is not to downplay the horrors faced by the young James, but to suggest that he and Miles survived conditions that were far more comparable than the majority lets on.
The relevant question, at any rate, is not whether Miles’s story is better or worse than any of the sad tales that have graced the pages of the Federal Reporter, but whether there is a “reasonable probability” that he would not have been sentenced to death had it been told. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Notably, “it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances.” Correll v. Ryan, 539 F.3d 938, 951-52 (9th Cir.2008). What is required “is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. In analyzing whether the new mitigation evidence creates the required “reasonable probability,” Strickland instructs us to consider whether “the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances.” Id. at 700, 104 S.Ct. 2052.
Applying this framework shows that Miles suffered prejudice due to Sattler’s deficient performance. The aggravating factors established at sentencing were not overwhelming: The judge relied on four, *1151 one of which was later overturned by the Arizona Supreme Court. The other three were based on (1) Miles’s three armed robberies, (2) the profit motive behind Miles’s participation in the crime, and (3) the “especially cruel manner” in which the murder was committed, a finding based on the fear suffered by Baeuerlen during the twenty minute drive out to the desert. Against these aggravating factors, the judge considered and rejected a variety of statutory and non-statutory mitigating factors. While the judge mentioned that he had received numerous letters attesting to Miles’s previously non-violent nature, he discounted the letters as irrelevant when considering the violent felon before him. There was no mention of Miles’s childhood.
Given the weakness of the aggravating factors and the total absence of any mention of Miles’s childhood in the judge’s sentencing, the additional mitigating evidence Sattler could have uncovered is sufficient to “undermine confidence in the outcome.” Strickland, 466 U.S. at 694,104 S.Ct. 2052. “[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.” Stankewitz v. Woodford, 365 F.3d 706, 716 (9th Cir.2004). Here, that discrepancy was substantial. As in Williams, “the graphic description of [Miles’s] childhood ... might well have influenced the [judge’s] appraisal of his moral culpability.” 529 U.S. at 398, 120 S.Ct. 1495.[3]
C. Conclusion
Reviewing Miles’s claim de novo, it is clear that Sattler’s performance was deficient, and that Miles was prejudiced by that deficiency. Sattler could not have reasonably chosen the particular strategy she decided upon without first making a reasonable investigation into Miles’s past, and the significance of the missing information is sufficient to undermine my confidence that Miles would nevertheless have been sentenced to death. I therefore dissent.

. Because AEDPA deference does not apply to the state court's rejection of Miles's Strickland. claim, Pinholster does not prevent consideration of evidence that was before the district court under § 2254(e)(2). Pinholster, 131 S.Ct. at 1401.

. Because I would reverse on the present record, I do not address whether Martinez v. Ryan, - U.S. -, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), allows Miles to introduce new facts at this stage.